583 P.2d 360

William KERNER and Charles Barnes, Individually, and as Directors of and on behalf of the American Falls Reservoir District No. 2, a Quasi Municipal Corporation, and Corwin Silva and Floyd Silva, Individually on behalf of themselves and all other holders of title to lands located and subject to assessment within the boundaries of the American Falls Reservoir District No. 2, who are similarly situated, Plaintiff-Appellants,

v.

R. Wendell JOHNSON, Cecil Trosper, Joe Pavkov, Robert Johansen, Charles Johnston, Individually and as Directors of American Falls Reservoir District No. 2, Defendants-Respondents.

Petition of the BOARDS OF DIRECTORS OF the AMERICAN FALLS RESERVOIR DISTRICT, A & B Irrigation District, American Falls Reservoir District No. 2, Enterprise Irrigation District, Hillsdale Irrigation District, Milner Low Lift Irrigation District, New Sweden Irrigation District, Poplar Irrigation District, Progressive Irrigation District, and Snake River Valley Irrigation District, Irrigation Districts Existing Under the Laws of the State of Idaho, Petitioners-Respondents,

and

Idaho Irrigation District, Supplemental Petitioner-Respondent,

v.

Don WIXOM, Robert Rucker and Vernon Kinnear, on behalf of themselves and on behalf of all other Owners or Holders of Evidence of Title to Lands located and subject to assessments within the Boundaries of A & B Irrigation District who are similarly situated; and William Kerner, Charles Barnes, Corwin Silva and Floyd Silva, on behalf of themselves and on behalf of all other Owners or Holders of Evidence of Title to Lands located and subject to assessment within the Boundaries of American Falls Reservoir District No. 2, who are similarly situated; and Del Hiatt, on behalf of himself and on behalf of all other persons who are Owners of Stock in the Northside Canal Company, and/or who are Owners of Title or Holders of Evidence of Title to Lands located and subject to assessments within the Boundaries of the American Falls Reservoir District who are similarly situated, Respondents-Appellants.

Nos. 12356, 12656.

Supreme Court of Idaho.

July 20, 1978.

Rehearing Denied Sept. 29, 1978.

436

James Annest of Annest & Anderson, Burley, for plaintiffs-appellants.

Thomas G. Nelson of Parry, Robertson, Daly & Larson, Twin Falls, for defendants-respondents.

BAKES, Justice.

These two cases, which have been consolidated on appeal, raise common issues relating to a proposed $44 million bond issue to finance the replacement of the American Falls Storage Reservoir on the Snake River in southern Idaho. This Court has previously considered the financing of this project in *Barker v. Wagner*, 96 Idaho 214, 526 P.2d 174 (1974), which held that the limitations on indebtedness of Art. 8, § 3, of the Idaho Constitution do not apply to irrigation districts.

I

Before examining in detail the issues raised by these two consolidated appeals, it is necessary to explain briefly the circumstances from which both actions arose. The original American Falls dam was built in

1928 by the Bureau of Reclamation as part of the Minidoka Reclamation Project. The United States entered into contracts with 35 different entities, including irrigation districts, canal companies, private corporations, individuals and an Indian reservation.[1] The contracts granted these entities water storage space in the reservoir in return for the repayment of a proportional share of the construction costs. These entities with contract rights for water storage space in the reservoir are generally referred to as "spaceholders" or "water users."

As early as 1929 the cement in the dam began to deteriorate, weakening the structure, and the Bureau of Reclamation therefore later placed restrictions on the maximum water level. A 1966 Bureau of Reclamation report concluded that the dam no longer met the agency's safety standards and included a proposal for the dam's replacement. The 1966 replacement proposal estimated that the replacement project would cost approximately $15 million, of which the water users would pay about $6 million. The report noted that replacement of the dam was urgent because the present water level restrictions could result in a water shortage for irrigators in extremely dry years. The report gave the project "highest priority." Studies by a private board of consultants in 1968 confirmed the bureau's findings concerning the safety of the dam and the need for the dam's replacement or rehabilitation.

In 1972 the maximum level was further restricted. That same year the Bureau of Reclamation's regional director completed a preliminary report which contained a plan for replacing the dam. The cost was estimated at about $29 million, of which water users would pay approximately $19 million.

The report and the replacement proposal were never fully reviewed by the Department of Interior.

Following the maximum level restrictions imposed in 1972, several individuals, who purported to represent the interests of some of the entities having storage rights in the reservoir, formed a committee known as the "Committee of Eight." The committee's principal objective was to pursue a private financing plan for the replacement of the dam. The committee believed that private financing would be a faster and surer method for replacing the dam than federal financing through the Bureau of Reclamation. In a resolution adopted in January of 1973, the American Falls Reservoir District (AFRD), an irrigation district with storage rights in the reservoir, resolved to pursue a private financing plan as an alternative to the Bureau of Reclamation proposal. A few days later the "Committee of Eight" adopted a similar resolution. The private financing plan being considered was a proposal by Idaho Power Company to finance the construction of a replacement dam by purchasing the "falling water" rights of the new dam for power generation. In the initial discussions Idaho Power estimated that the cost of the replacement dam would be about $20½ million, of which it would absorb about $19 million as consideration for the falling water rights. This would leave about $1½ million to be paid by the water users.

Implementation of the Idaho Power proposal required both state and federal legislation. In 1973 Idaho Code Title 43, chapter 4, was amended by adding § 43–401A, which authorized an irrigation district to contract for the replacement of dams and other structures and, following approval by

1. The 35 entities are as follows: A & B Irrigation District, Aberdeen-Springfield Canal Co., American Falls Reservoir District, American Falls Reservoir District No. 2, Blackfoot Irrigating Company, Burgess Canal & Irrigating Co., Burley Irrigation District, Butte & Market Lake Canal Co., Clement Bros., Corbet Slough Ditch Co., Dilts Irrigation Co., Ltd., Enterprise Canal Co., Ltd., Enterprise Irrigation District, Falls Irrigation District, Harrison Canal & Irrigation Co., Hillsdale Irrigation District, Ray B. An-

drus, Idaho Irrigation District, Idaho Power Co., Lenroot Canal Co., Martin Canal Co., Michaud Division of Fort Hall Indian Reservation, Milner Low Lift Irrigation District, Minidoka Irrigation District, North Side Canal Co., Ltd., Peoples Canal & Irrigation Co., Poplar Irrigation District, Reid Canal Co., Rudy Canal Co., Ltd., Snake River Valley Irrigation District, Trego Ditch Co., Utah-Idaho Sugar Co., Woodville Canal Co.

a special election, to issue bonds to finance the construction. Chapter 4 was also amended by the addition of § 43–404A, which authorized a district (referred to as the constructing district) proposing the replacement of a structure that benefitted several districts or water users to contract with those other districts or users for payment of their proportionate share of the cost. The section provides that if a water user contracting to pay its proportionate share is an irrigation district (referred to as a contracting district) the proposed contract must be approved in an election by at least two thirds of the electors. In addition, § 43–404A requires confirmation proceedings in the district court following approval by the electorate but before execution of the contract.

In 1973 the United States Congress enacted Public Law 93–206 which authorized the Secretary of Interior to enter into agreements with the AFRD or other agency representing the spaceholders (referred to as the constructing agency) to finance the construction of the replacement dam.[2] The statute provided that upon completion the United States would take title to the dam and operate and maintain the dam as part of the Minidoka Project. Public Law 93–206 further provided that the replacement of the existing dam was not to alter the storage rights of the present spaceholders except as provided in that act. The act authorized the "constructing agency" to enter into contract with the present spaceholders for repayment of the project cost and provided that the "delivery of water to the spaceholders shall be contingent upon the execution of such contracts and the fulfillment of the obligations thereunder . . . ." Pub.L.No. 93–206, § 3, 87 Stat. 904, 905 (1973).

In 1974 Chapter 22 was added to Title 43 of the Idaho Code. I.C. §§ 43–2201 through

**2.** Public Law 93–206 reads in pertinent part: *"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior (hereinafter called the Secretary) is authorized to negotiate and enter into agreements with the American Falls Reservoir District or other appropriate agency representing the present spaceholders (hereinafter called the constructing agency), which agreements shall authorize the constructing agency to finance and provide for the construction of a dam and related facilities to replace the existing American Falls Dam of the Minidoka project, Idaho-Wyoming. The United States shall take title to the dam upon a determination by the Secretary that construction of the dam is substantially completed, and the dam shall be a feature of the Minidoka reclamation project and shall be considered to be a 'Government dam' as defined by the Federal Power Act (Act of June 10, 1920, 41 Stat. 1063, as amended). The Secretary shall operate and maintain the replacement dam as a feature of the Minidoka project. . . .

"Sec. 2(a) Replacement of the existing dam as authorized in section 1 hereof shall in no way alter or change the present proportionate storage rights of present spaceholders in the American Falls Reservoir and shall constitute a reaffirmation of existing contract rights between the Secretary and the spaceholders except as otherwise provided in this Act.

. . . . .

"Sec. 3. The constructing agency may enter into repayment contracts with the spaceholders in the existing American Falls Reservoir providing for the repayment by the spaceholders of proportionate shares of the total project costs incurred by the constructing agency for engineering, financing, designing, and constructing the replacement dam, and the Secretary shall be a party to said contracts and the delivery of water to the spaceholders shall be contingent upon the execution of such contracts and the fulfillment of the obligations thereunder: *Provided,* That said contracts shall be consistent with the terms of existing contracts between the Secretary and the spaceholders for repayment of the costs of the existing American Falls Dam.

"Sec. 4. The constructing agency may contract with an appropriate non-Federal entity for the use of the falling water leaving the dam for power generation, which contract shall provide for a monetary return to the constructing agency to defray the costs of construction of the replacement dam. The constructing agency may enter into agreements with an appropriate non-Federal entity to coordinate the construction of hydroelectric power facilities with the construction of the replacement dam. The contract and agreements for use of the falling water shall not be subject to the limitations of section 9(c) of the Reclamation Project Act of 1939 (53 Stat. 1194), or any similar limitations in any other applicable Acts of Congress: *Provided.* That said contract for falling water shall be approved by the Secretary and shall not impair the efficiency of the project to serve the other purposes of the Minidoka project."

–2207. The provisions of this chapter authorize irrigation districts to replace or improve dams and related structures, I.C. § 43–2201(A), to enter into contracts for that purpose, I.C. § 43–2201(B), and to issue bonds to finance the improvements, I.C. § 43–2201(C). The chapter also specifies the manner in which the bonds and the construction costs are to be paid. I.C. § 43–2201(D) to (E). Section 43–2204 requires a confirmation proceeding in the district court either before or after the execution of the contracts but before the sale and issuance of any bonds.

Idaho Power subsequently determined that the construction of the replacement dam would cost substantially more than $20 million. It was ultimately decided that authority for a bond issue of $44,750,000 would be necessary. Idaho Power agreed to increase its share by the cost of water quality facilities which had to be constructed in order for the project to satisfy environmental standards. Of the $44,750,000, $22,965,734.00 was ultimately allocated to Idaho Power and $21,784,266.00 was apportioned among the 35 entities having storage rights in the present reservoir. Construction of the replacement dam was to be financed by bonds issued by the AFRD. In accordance with the provisions of I.C. § 43–2201(D) the AFRD would also make the bond payments but only from a special fund into which it would deposit (1) assessments collected on lands in its district, (2) payments it would receive pursuant to repayment contracts with other spaceholders, and (3) payments from Idaho Power for the falling water rights.

In order to implement this proposed arrangement several contracts were negotiated. The most significant were:

1. The "government contract" between the United States and the AFRD as authorized by Public Law 93–206.

2. The "falling water contract" between the AFRD and Idaho Power in which Idaho Power agreed to pay a portion of the construction cost as consideration for the falling water rights.

3. The "water quality facilities contract" between the AFRD and Idaho Power, which delineates their obligations concerning these facilities.

4. The "spaceholder contracts" between the United States, a present spaceholder and the AFRD for repayment of the spaceholder's proportionate share of the construction cost.

On November 4, 1975, the Board of Directors of the AFRD adopted a resolution pursuant to I.C. § 43–2203 stating that the interest of the AFRD and the public interest and necessity demanded the construction of the replacement dam and a bond issue of $44,750,000. The resolution also allocated the cost of paying the bonds among Idaho Power and the various water users. I.C. § 43–2203 provides that if a referendum petition is submitted to the board within 15 days after the adoption of the resolution the board must hold an election on the question of the bond issue. No such petition was filed. However, the statute has no provision for notice to the electorate of the adoption of the resolution.

On December 2, 1975, the Board of Directors of the AFRD adopted another resolution calling for an election on whether the district should enter into the proposed contracts. The election was held and the proposal was approved by more than two-thirds of the voters. Similar elections were held in other districts with storage rights in the reservoir on whether to execute the proposed spaceholder contracts and to impose assessments for their share of the construction costs. However, there was a dispute whether the voters were adequately informed about the terms, costs and implications of the proposal and about the possible Bureau of Reclamation alternative.

The proposal was ultimately approved by all but eight of the 35 entities with storage rights in the existing reservoir. Those eight which did not approve the proposal and have not executed spaceholder contracts are generally referred to as "non-participating water users." According to the terms of the falling water contract, Idaho Power is obligated to make the payments

that the non-participating water users would have been obligated to make if they had executed spaceholder contracts. Idaho Power is also obligated to make the payments owed by a participating water user who has defaulted.[3] The purpose of these provisions was to make the bonds more marketable at a lower interest rate by insuring that there would not be a default on the bond payments.

In a memorandum to the Secretary of Interior in late December, 1975, William Burpee, field solicitor for the Department of Interior, commented on possible federal liability in connection with the replacement dam project. Burpee noted that the proposed contracts, pursuant to Public Law 93–206, make the delivery of water contingent upon the execution of a spaceholder contract. In the memorandum, Burpee indicated that a non-participating water user with storage rights in the existing reservoir might argue that it had no obligation to pay the costs of the replacement dam but that the United States was required by the existing contract to replace the dam and that a refusal by the United States to deliver water because of the user's refusal to pay its share of the construction costs would be a breach of that contract. Burpee stated that a non-participating water user might also argue that Public Law 93–206, which authorized the United States not to deliver water to non-participating users, was an unconstitutional taking of property or a taking of their contract right to interest free federal financing under the reclamation laws. Burpee noted, however, that provisions in the government contract required the AFRD to indemnify the United States for all such claims.

As a consequence of this memorandum and after voter approval of the proposed contracts, clauses were inserted in the government contract and the spaceholder contracts specifically stating that if the AFRD is required to indemnify the United States for any such claims, the indemnity payments would be paid first from the construction fund as a cost of construction and then from the regular operating and maintenance payments.

Following the elections, petitions requesting a new election were submitted to the boards of directors of the A & B Irrigation District and the American Falls Reservoir

3. Section 3.4 of the falling water contract provides in pertinent part:

"Section 3.4. *Supplemental Falling Water Payments.* (A) The Constructing Agency and the Idaho Power Company recognize that a higher investment quality rating for the Bonds will be obtained from the respective rating agencies by the Constructing Agency (resulting in a lower net interest cost on the Bonds), if the Idaho Power Company would agree to make to the Trustee on behalf of the Constructing Agency, Supplemental Falling Water Payments in the manner contemplated in this Section 3.4, in the event that Waterusers fail to execute Spaceholder Contracts hereby becoming Non-Participating Waterusers or in the event that Spaceholders to which Article 17 of the Government Contract applies default in the making of all or any part of a Spaceholder Payment. Accordingly, within seven (7) days after the occurrence thereof, the Constructing Agency, or the Trustee on behalf of the Constructing Agency, or the Contracting Officer, as the case may be, shall give notice to the Idaho Power Company, the Contracting Officer, the Constructing Agency, the Defaulted Spaceholder and the Non-Participating Wateruser as the case may be, in the manner provided in Section 14.6 hereof, of:

"(1) any default by any Spaceholder to which Article 17 of the Government Contract applies under a Spaceholder Contract of its obligation to make all or any part of a Spaceholder Payment, or

"(2) failure to receive all or any part of a Spaceholder Payment which would have been due with respect to the space of a Non-Participating Wateruser had the Non-Participating Wateruser executed a Spaceholder Contract.

"(B) The Idaho Power Company shall make a Supplemental Falling Water Payment to the Trustee, within ten (10) days after the notice provided for in (A) of this Section 3.4 has been given, which shall be sufficient:

"(1) to pay all Spaceholder Payments including penalties and interest, or any portion thereof, then in default and due under any Spaceholder Contract, and

"(2) to pay all Spaceholder Payments, including penalties and interest, or any portion thereof, which would have been due and payable with respect to the space of a Non-Participating Wateruser had the Non-Participating Wateruser executed a Spaceholder Contract and defaulted on the Spaceholder Payments becoming due and payable thereunder, as contemplated in Article 17(b) of the Government Contract."

District No. 2 (AFRD No. 2), both of which had approved the proposal in their elections. William Kerner, who was president of AFRD No. 2, refused to execute the spaceholder contract, expressing doubts concerning its legality. I.C. § 43–2205 provides that in the event an officer refuses to execute such a contract because he believes it is illegal, the board may institute judicial proceedings to compel execution of the contract and to determine its legality. Rather than institute those proceedings, the board, upon advice of counsel, concluded that the president served at the board's pleasure pursuant to I.C. § 43–301 and simply reorganized and elected a new president who executed the contract. Construction of the replacement dam has commenced.

## II

From this sequence of events, the two actions involved in this appeal resulted.

In the first, *Kerner v. Johnson*, No. 12356, the plaintiff appellants *Kerner et al.* commenced an action in the Fifth Judicial District Court, Lincoln County, seeking a declaratory judgment that the execution of the spaceholder contract by AFRD No. 2 was *ultra vires* and therefore null and void and requesting the court to order a new election. The plaintiffs alleged that the action was *ultra vires* because a confirmation proceeding had not been held prior to the execution of the contract, because the board had failed to institute the judicial proceedings provided by § 43–2205 in order to compel Kerner to execute the contract and to test its legality, and because the contracts were substantially altered after the election. The district court dismissed the action on the ground that the confirmation proceeding which I.C. § 43–2204 required the boards to institute was the appropriate forum in which to decide these issues. The plaintiff appellants have appealed from that dismissal.

The second action consolidated in this appeal, *Boards of Directors v. Wixom*, No. 12656, involves a confirmation proceeding commenced pursuant to I.C. § 43–2204 to obtain judicial review and confirmation of the various acts, proceedings and contracts relating to the proposed bond issue by the AFRD. The petitioners, who are respondents on appeal, are the boards of directors of various irrigation districts which have approved the proposal and have executed spaceholder contracts. In response to the confirmation petition the Minidoka Irrigation District, a non-participating water user, filed an answer alleging that it had storage rights in the present dam under an existing contract with the United States and that any provisions in the government or spaceholder contracts which would terminate or impair those rights because of its status as a non-participating user were unlawful. The answer prayed that the confirmation order be limited to those provisions of the contracts which did not interfere with its rights, that the court determine the extent of its storage rights, and that the petitioning districts be enjoined from interfering with those rights.

The respondents below (appellants on appeal), who are landowners in three of the participating districts, moved to dismiss the petition for lack of personal and subject matter jurisdiction, failure to join indispensable parties and improper venue. Following the submission of the Minidoka Irrigation District's answer and the respondents' motion to dismiss, the petitioners filed a motion *in limine* seeking an order that the court had no jurisdiction over the existing contracts of non-participating users. The petitioners and the Minidoka Irrigation District later stipulated that the court had no jurisdiction over those existing contracts and that the judgment in the confirmation proceeding could not affect the rights of the non-participating districts under the existing contracts with the United States.[4] Acting on this stipulation, the district court entered an order to that effect, and the non-participating districts did not further participate in the confirmation proceedings.

---

4. Although it had not formally answered the confirmation petition, the Burley Irrigation District, a non-participating water user, also executed a similar stipulation with the petitioners.

The hearings on the confirmation petition then commenced. After eight days of trial, the district court issued a memorandum decision confirming the actions and contracts of the petitioning districts and rejecting the objections of the respondents. The district court instructed the petitioners to prepare formal findings of fact and conclusions of law consistent with that memorandum decision, which the petitioners did. The respondents filed a motion for new trial and objections to the findings of fact and conclusions of law. Following a hearing on this motion and the objections to the findings, the court denied them.[5] A judgment of confirmation was then entered. The respondents below have appealed from that judgment of confirmation.

## III

We now consider the legal issues raised in these two appeals. In the two proceedings below and on appeal the parties have acquired several procedural names. In order to avoid confusion, we refer to the four plaintiff-appellants in *Kerner v. Johnson,* No. 12356, and the eight respondents below who have appealed in *Boards of Directors v. Wixom,* No. 12656, as "appellants"; and the defendants in *Kerner* and the petitioners in *Wixom* as "districts."

The appellants have made numerous assignments of error. We consider first those concerning the confirmation proceeding in *Wixom* and then those concerning the dismissal of the declaratory judgment action in *Kerner.*

Before addressing the specific arguments advanced by the appellants, we believe it is important to clarify the nature and purpose of the confirmation proceeding involved in *Wixom.* The districts filed the petition for confirmation pursuant to I.C. § 43–2204. Although § 43–2204, as it applies to this case, concerns a unique situation—the replacement of a dam or related structure involving the participation of several irrigation districts—the judicial review required by that section is the same kind of proceed-

ing which has long been a part of bond issuances by irrigation districts in Idaho. In *American Falls Irrigation District v. Thrall,* 39 Idaho 105, 228 P. 236 (1924), which coincidentally involved a confirmation proceeding in connection with the construction of the original American Falls dam, the Court stated:

"It is a matter of common knowledge that bonds about which there is no question as to their validity and payment at maturity can be sold for more than bonds which are liable to be assailed and questioned years after their issuance, and that bonds of doubtful validity are reluctantly taken at any price. It was doubtless for the purpose of settling this class of questions in advance and thereby making the bonds of irrigation districts more readily salable and at better prices than they would otherwise command that the legislature passed the confirmation acts providing that districts might, before offering their bonds, have all questions affecting their validity judicially and finally determined. The confirmation proceeding is in the nature of a proceeding *in rem,* the object being to determine the status of the district and its power to issue valid bonds." 39 Idaho at 135, 228 P. at 245.

*Accord, Nampa & Meridian Irrigation Dist. v. Brose,* 11 Idaho 474, 83 P. 499 (1905); 3 C. Kinney, A Treatise on the Law of Irrigation and Water Rights, §§ 1420, 1421 (2d ed. 1912). Likewise, the confirmation proceedings we consider here are designed to settle at an early stage issues concerning the legality of the various acts and proceedings which underlie the proposed bond issue and thereby insure the validity of that bond issue.

■ 1. The appellants first raise a procedural issue concerning their status in the confirmation proceedings. The appellants argue that they are individual landowners representative of other landowners within their respective districts and are therefore entitled to maintain their protest as a class

---

5. The petitioners, however, were permitted to reopen in order to correct an error in the as-

sessments and the findings were amended to reflect that correction.

proceeding under I.R.C.P. 23(a) and (b) and, with respect to appellants Kerner, Barnes, and Silva, as a derivative action under I.R. C.P. 23(f). At the outset we question whether I.C. § 43–2204 contemplates a class proceeding in answer to a confirmation petition. The confirmation proceeding is essentially an *in rem* proceeding in which "any owner of property in any district joining in the petition or any other person interested in the contracts or proposed contracts may appear and answer said petition . . . and the petition shall be taken as confessed by all persons who fail so to appear." I.C. § 43–2204. Since the object of the confirmation proceeding is to test the legality of the various acts and proceedings by the districts, it would not seem to make

any difference whether the objections to the confirmation petition were made by representatives of a class or by individual landowners within the districts.

However, we need not reach the issue whether a class action may be maintained in confirmation proceedings under § 43–2204 since these appellants have failed to satisfy the requirements for a class proceeding prescribed by I.R.C.P. 23. I.R.C.P. 23(a) and (b) list the prerequisites and conditions to a class action.[6] I.R.C.P. 23(f) states the requirements for a derivative action.[7] The appellants' pleadings did not allege compliance with these rules, and even under a very generous reading of the allegations stated in their pleadings it cannot be said that they alleged satisfaction of the condi-

6. "[I.R.C.P.] 23(a). PREREQUISITES TO A CLASS ACTION.—One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

"[I.R.C.P.] 23(b). CLASS ACTIONS MAINTAINABLE.—An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or de-

fense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

7. "[I.R.C.P.] 23(f). DERIVATIVE ACTIONS BY SHAREHOLDERS.—In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the state of Idaho which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."

tions and prerequisites of a class action clearly stated by our rules. Moreover, it does not appear that the appellants sought a judicial determination of whether the class action could be maintained as contemplated by I.R.C.P. 23(c)(1).[8] Aside from the statement in the title of their pleadings that the appellants were responding to the confirmation petition on behalf of themselves and other landowners within their respective districts, the appellants did nothing in the proceedings below to establish satisfaction of the prerequisites and conditions stated in I.R.C.P. 23(a), (b) and (f). We therefore affirm the trial court's finding that the appellants "at the trial offered no evidence, nor did they allege . . . facts sufficient to support certification of the action as a class action, or derivative action" and also affirm the trial court's conclusion that the appellants "have not complied with the requirements of Rule 23, Idaho Rules of Civil Procedure, and this action cannot be maintained as a class or derivative action."

2. The appellants make several arguments concerning the subject matter and personal jurisdiction of the district court. Although phrased in various ways, these arguments essentially call into question the district court's action in granting the motion *in limine* and continuing with the confirmation proceedings in the absence of the non-participating water users and without considering the effect of Public Law 93–206 and the new contracts on the existing contracts of the non-participating users. The order granting the motion *in limine* was based on stipulations between the petitioning districts and two non-participating irrigation districts that the district court had no jurisdiction over the existing contracts between the non-participating water users and the United States and that the judgment of confirmation would not affect the contract rights of the non-participating users.

▮ The jurisdiction and duty of the district court in this confirmation proceeding is prescribed by I.C. § 43–2204, which provides in pertinent part:

"43–2204. JUDICIAL EXAMINATION.— . . .

" . . . The said petition and notice shall be sufficient to give the court jurisdiction and, upon hearing, the court shall examine into and determine all matters and things affecting the question submitted, shall examine all of the proceedings of all of the irrigation districts as set forth in the petition, shall hear all objections either filed in said proceeding or brought up from the hearings before any of the boards, shall correct all errors in the assessments and apportionments of costs, shall ratify, approve and confirm all apportionments of costs and assessments levied, shall make such findings with reference thereto and render a judgment and decree thereon approving and confirming all of the powers, assessments, apportionments, acts, proceedings and contracts of each of the irrigation districts as set forth in the petition as the case warrants. . . . "

Although § 43–2204 directs the court to examine a broad range of matters, that section does not require the court to resolve in a confirmation proceeding every legal issue which may arise in connection with the project, particularly a project as massive and complex as the replacement of a major federal dam. *See United States v. Imperial Irrigation Dist.*, 559 F.2d 509, 525 (9th Cir. 1977) (considering a California confirmation proceeding). Rather, the district court in a confirmation proceeding pursuant to § 43–2204 is only required to consider those matters which affect or are somehow pertinent to the proposed bond issue.

▮ In this regard it is important to remember that the non-participating irriga-

8. "RULE 23(c). DETERMINATION BY ORDER WHETHER CLASS ACTION TO BE MAINTAINED: NOTICE: JUDGMENT: ACTIONS CONDUCTED PARTIALLY AS CLASS ACTIONS.—(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

446

tion districts are not participating in the bond issue, assessments are not being imposed against their lands with respect to this proposed bond issue, and they are not parties to the contracts forming the basis of the bond issue. The concern of the non-participating water users relates to the provision of Public Law 93–206 which makes the delivery of water to spaceholders contingent upon the execution of a new repayment contract. This issue does not concern the validity of the proposed bond issue, but concerns whether a future refusal by the United States to deliver water to the non-participating users because of their failure to execute new repayment contracts would constitute a breach of those existing contracts or perhaps a taking of a property interest protected by the Fifth Amendment to the United States Constitution. Whether the United States, in exercising its authority to regulate the use of federal reclamation projects, has imposed a condition which impairs a compensable property right of the non-participating water users is a separate legal issue which must be litigated by those parties. If a protected property interest of the non-participating water users is impaired, then they may well have a claim against the United States for damages. *Dugan v. Rank,* 372 U.S. 609, 619, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 291, 78 S.Ct. 1174, 1183, 2 L.Ed.2d 1313 (1958); *see United States v. Imperial Irrigation Dist.,* 559 F.2d 509, 542 (9th Cir. 1977); *Scenic Hudson Preservation Conference v. Federal Power Comm'n,* 453 F.2d 463, 478 (2d Cir. 1971), *cert. denied* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972); 2 Water and Water Rights §§ 116.3, 119 (R. Clark ed. 1967). However, that possible

claim for compensation does not affect these confirmation proceedings, which concern whether the *participating* districts have complied with the prerequisites for a valid bond issue. *See Ivanhoe Irrigation Dist. v. McCracken, supra; Ivanhoe Irrigation Dist. v. All Parties and Persons,* 53 Cal.2d 692, 3 Cal.Rptr. 317, 350 P.2d 69, 90 (1960). The effect of the judgment of confirmation is limited to those issues and does not affect matters outside the scope of the proceedings, such as any claims which the non-participating water users may have against the United States under their existing contracts if the United States does indeed refuse them delivery of their water. *See United States v. Imperial Irrigation Dist., supra.* Therefore, we conclude that the district court had jurisdiction over the confirmation proceedings and considered all issues presented to it which were relevant to those proceedings and that all the parties necessary for a complete adjudication of the confirmation petition were joined.

■ 3. The appellants next argue that the new contracts and Public Law 93–206 constitute an unconstitutional taking or impairment of their vested property interests in violation of Art. 1, § 14, of the Idaho Constitution and the Fifth Amendment and Art. 1, § 10, of the United States Constitution.[9]

■ The appellants first assert that the new contracts divest them of their rights secured by the existing contracts and the reclamation laws. In this regard the appellants cite various sections of the federal reclamation laws which generally concern the repayment of the construction and operation costs of a federally financed reclamation project.[10] This case, however, involves

9. Although the constitutional prohibition of the impairment of contracts contained in Art. 1, § 10, of the United States Constitution applies only to the states, rights against the United States arising out of a contract with it are protected by the Fifth Amendment. *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). Art. 1, § 14, of the Idaho Constitution provides in pertinent part: "Private property may be taken for public use, but not until a just compensation, to be ascertained

in the manner prescribed by law, shall be paid therefor."

10. Appellants cite 43 U.S.C. § 423b (suspension or adjustment of charges against temporarily unproductive land), § 423e (delivery of water from a new project contingent upon execution of repayment contract), § 461 (determination of construction charges), § 469 (increase in construction charges), § 479 (no delivery to water right applicant in arrears more than one year),

the replacement of the dam through a private financing plan. Moreover, pursuant to Public Law 93–206 and the provisions of the new contracts, the existing contracts are specifically reaffirmed except as modified by the new spaceholder contracts.[11] In considering this claim it is essential to remember the relationship of these appellants, who are landowners within participating districts, to their respective irrigation districts, to the federal government and to the repayment contracts. The parties to the existing repayment contracts are irrigation districts and the United States—not the individual landowners and the United States. *See* 43 U.S.C. § 485h(d) (secretary to execute repayment contracts with water users' organizations); *see generally* 2 Waters and Water Rights, § 123.2(H), *supra*. The execution of the new spaceholder contracts does not abrogate any contractual rights of the landowners to the delivery of water from a federal reclamation project based on a contract between the individual landowners and the United States, for there is no such contract. Rather, the execution of the new spaceholder contracts represents a modification by the participating irrigation districts and the United States of *their* previous contracts. To be sure, the individual landowners have a right to the delivery of water from their irrigation district, water which the district receives from the federal government pursuant to its contract. But the landowners have no right to receive that water always at the same price or on exactly the same conditions. The board of directors of each district may determine that the fulfillment of their statutory duty to protect their district's water rights and to assure that sufficient irrigation water will be available to all the lands within their district, I.C. §§ 43–304, –2203, requires them to make various capital improvements to the water system. Such improvements require increased assessments and may even dictate the delivery of water on perhaps slightly different terms. However, when as here more than two-thirds of the landowners of the irrigation district have voted to approve the execution of contracts to repay their proportionate amount of major new capital improvements in order to assure that adequate supplies of water will be available, we cannot say that the action of the board of directors divests those landowners who voted against the contracts of valuable property rights.

▊ It appears that the heart of the appellants' grievance is an apparently genuine belief that the execution of the spaceholder contracts was a wrong decision and that the interests of the districts and the landowners would have been better served by the pursuit of a federal financing plan. However, that is a policy decision entrusted to the boards of directors of the districts and subject to the approval of the voting landowners. That decision has been made and was

---

§ 485 (variable payments of construction charges), §§ 502 and 503 (emergency fund to defray expenses incurred because of emergency conditions), § 504 (rehabilitation of federal reclamation projects). In particular, the appellants stress that the forfeiture provisions for non-payment in the private financing plan are stricter than those under a federally financed project.

11. The spaceholder contract provides:
"19. (a) . . . The provisions of the Existing Spaceholder Contract shall in all respects remain in full force and effect except that the provisions of this Spaceholder Contract with respect to the Replacement Dam, including but not limited to the operation and maintenance there of and the distribution of water therefrom, shall prevail over the provisions of the Existing Spaceholder Contract wherever and to whatever extent the provisions of the Existing

Spaceholder Contract are in conflict with the provisions of this Spaceholder Contract. The provisions of the Existing Spaceholder Contract which have application to any other reserved works of the Minidoka Project shall, in all respects, continue in effect and shall continue to apply to any other reserved works of the Minidoka Project."
The government contract provides:
"9. (a) This Government Contract is entered into by the Secretary in accordance with the Act of December 28, 1973, to authorize the Constructing Agency to finance and provide for the construction of the American Falls Replacement Dam Program to replace the Existing Dam. The American Falls Replacement Dam Program shall in no way alter or change the present proportionate storage rights of the Waterusers, except as provided herein and as set forth in the Spaceholder Contracts."

448

approved by the voters. In that political process the appellants' position was simply rejected. We emphasize that it is not the function of the courts in a confirmation proceeding to review the merits of the board's decision. Those policy decisions belong to the boards of directors and the voting landowners. Our duty is limited to determining whether the decision was made and carried out in accordance with the law.

■ The appellants also claim to have vested interests in the falling water rights and argue that those interests are taken from them by the new contracts. In 1923 the federal government acquired from Idaho Power Company the site of the original dam and the water rights for power production. The government included the cost of those acquisitions as a construction charge to the spaceholders. The appellants, who are landowners in districts which have been repaying these construction charges, claim that they therefore "own" some of the falling water rights. However, it is clear that the rights for power production are the property of the United States. *Burley Irrigation Dist. v. Ickes*, 73 App.D.C. 23, 33, 116 F.2d 529, 539 (1940), *cert. denied* 312 U.S. 687, 61 S.Ct. 614, 85 L.Ed. 1124 (1941). *See generally* 2 Waters & Water Rights § 123.-2(I), *supra*. For example, the existing repayment contract with the AFRD No. 2 provides:

"*Title to and Operation of Powerplant; Power Revenues*

"15. (a) Title to American Falls dam powerplant and all works incidental and appurtenant thereto, built or to be built by the United States, shall remain in the United States until otherwise provided by the Congress. The United States, in its operation of this powerplant, will be governed by the provisions of the contract of June 15, 1923, with the Idaho Power Company, as that may be amended, as further limited by the provisions of article 32.

"(b) All revenues derived from the sale or other use or disposal of power and energy developed at the American Falls Dam shall be and remain the property of the United States." Amendatory Contract No. 14–06–W–73 between the United States and the AFRD No. 2 (Oct. 14, 1954).

The landowners do not own any of the falling water rights and the United States, as owner of those falling water rights could, through Public Law 93–206, authorize the AFRD, the constructing agency, to contract with Idaho Power Company regarding the falling water rights in order to finance the construction of the replacement dam.

The appellants lastly argue that their vested property rights are somehow impaired because the new contracts require them to pay for public use aspects of the project. Assuming *arguendo* that some features of the present project, the costs of which will be charged to the spaceholders, would have been considered a public use had the Bureau of Reclamation financed the project and therefore either not allocated to the spaceholders or considered a non-reimbursable expense, *see generally* 2 Waters & Water Rights §§ 112.3(P), 123.-2(A), *supra*, the present allocation of costs and obligations of the spaceholders as provided by the new contracts were nevertheless approved by the districts and the voters. In this respect, the districts may well have been able to get a better bargain under a federally financed project. However, as we emphasized earlier, those questions are not within our scope of review.

■ 4. Appellants argue that the AFRD illegally acted as a representative of the other spaceholders and exercised power over them without their consent and without statutory authorization. The appellants alternatively argue that if chapter 22 of title 43 of the Idaho Code does impose an agency relationship between the AFRD and the other water users, the chapter violates Art. 3, § 19, and Art. 11, § 2, of the Idaho Constitution. Those constitutional provisions contain prohibitions against special laws and charters.

We need not reach the constitutional questions because chapter 22 does not impose an agency relationship between the

AFRD and other irrigation districts and does not establish a new entity with authority over the spaceholders in the present dam. I.C. § 43–2201 merely extends the authority of an irrigation district to include the power to improve or replace dams and related structures. It is apparent from § 43–2201 that where the proposed improvements would inure to the benefit of several irrigation districts or other entities, as in this case, the legislature intended to authorize an irrigation district to execute contracts for the construction of the entire project and issue bonds to finance the construction and then to enter into repayment contracts with other irrigation districts or other entities benefitting from the improvements and willing to participate in their construction.

Although the AFRD was certainly an ardent proponent of the private financing plan and played a major role in its development, it exercised no power over and had no agency relationship with any other irrigation district except as was created by the spaceholder contracts. Chapter 22 of title 43 does not require other irrigation districts to enter into contracts with the AFRD; it merely empowers the districts to do so. Neither chapter 22 nor Public Law 93–206 require the AFRD to act as the constructing agency and to issue the bonds. The other entities with storage rights in the present reservoir were free to reject the proposal and to present an alternative with another entity acting as the constructing agency or with a different financing arrangement. In sum, I.C. § 43–2201 merely empowers the irrigation districts, at their option and in their discretion, to enter into legal arrangements for the replacement or improvement of dams and related structures. The AFRD and the participating irrigation districts properly exercised that authority in execution of the various contracts for the replacement of the American Falls dam.

■ 5. The appellants argue that the district court improperly delegated the preparation of the formal findings of fact and conclusions of law to counsel for the districts. Following a protracted trial of this very complicated case, the trial judge issued a lengthy and detailed memorandum decision resolving the pertinent issues of fact and law. The memorandum decision did, however, request counsel for the districts to prepare proposed findings of fact and conclusions of law consistent with the decision. Preparation of those findings and conclusions in this case of course required very detailed findings concerning the election results in several irrigation districts and the exact allocation of the bond payments among the several participating districts and water users. The record indicates that the trial judge reviewed the initial findings and conclusions prepared by counsel and returned them to counsel requesting certain deletions. The trial court held a hearing on the appellants' objections to those findings and conclusions, and the trial judge stated that he "did feel that the final product was adopted as my product rather than theirs." Moreover, the appellants on appeal have not cited any portion of the final findings of fact and conclusions of law which is inconsistent with the trial court's memorandum decision. The procedure followed by the trial court was proper and appropriate under the circumstances of this case. See I.R.C.P. 52(a); *Compton v. Gilmore*, 98 Idaho 190, 560 P.2d 861 (1977); 9 C. Wright &. A. Miller, Federal Practice & Procedure, Civil § 2578 (1971).

■ 6. The appellants argue that I.C. § 43–2203 violates the due process clause of Art. 1, § 13, of the Idaho Constitution. I.C. § 43–2203 empowers the board to impose a bonded indebtedness upon the lands of the irrigation district by resolution and provides that the resolution will become final unless a referendum petition seeking an election on the question is filed within fifteen days after the passage of the resolution. I.C. § 43–2203 does not require notice to the electorate of the adoption of a resolution and such notices were not given in this case, and the appellants argue that unless the landowners are given notice of the resolution they will not be afforded an opportunity to object and submit a referendum petition.

However, even though a board's resolution to issue bonds or other obligations in order to finance the replacement or improvement of dams and related structures becomes final if a referendum petition is not filed within fifteen days, the board cannot actually execute contracts for the proposed construction, issue bonds or impose assessments unless notice of the proposed actions has been given to the landowners within the district and unless the proposal has been approved in an election. I.C. §§ 43–2201(D)(1) and –2201(D)(2) require that an election be held pursuant to chapter 4 of title 43 of the Idaho Code in each district on the question of the execution of the proposed contracts by that district and the imposition of assessments in that district. I.C. § 43–401 contains provisions requiring the publication of notice of the election.[12] Thus, although the board's resolution may become final without some of the landowners within the district having knowledge of its adoption, the landowners will suffer no detriment and no burdens will be placed on their land until they have been given notice of the proposed contracts and assessments and have been afforded an opportunity to approve or reject the proposed actions in an election. Moreover, I.C. § 43–303 requires the board of directors of an irrigation district to hold public meetings and to keep all records of the board open for public inspection during business hours.[13] Although I.C. § 43–2203 does not require the board to affirmatively publish notice of the adoption of the resolution, adopted of that resolution cannot be done in secret or knowledge of the action hidden from the public. Interested landowners—

through the exercise of reasonable diligence—can learn of the board's action in order to prepare and submit a referendum petition. In any event, landowners will suffer no detriment until they have been given notice of the proposed actions and an opportunity to accept or reject the proposal in an election. The appellants have not cited any authority on point in support of their argument, and we conclude that under these circumstances the failure of I.C. § 43–2203 to require publication of notice of the board's adoption of the resolution authorized by that section does not violate the due process clause of Art. 1, § 13, of the Idaho Constitution.

7. The appellants next argue that I.C. § 43–2203, which authorizes the board of directors of the constructing district to determine whether the public interest or necessity demands the replacement of a dam or related structure, constitutes an unconstitutional delegation of legislative power under Art. 3, § 1, of the Idaho Constitution. That section of the Constitution vests the legislative power of the state in the Senate and the House of Representatives.[14] The appellants contend that § 43–2203 does not provide adequate guidelines for determining the public interest and that the section authorizes the board to legislate, not merely to find facts.

Although it is well established that the legislature cannot delegate any of its power to make laws to any other body or authority, the legislature can empower an agency or an official to ascertain the existence of facts or conditions upon which the

---

12. I.C. § 43–401 provides in pertinent part: "Notice of such election must be given by posting notices in three (3) public places in each election precinct in said district at least four (4) weeks before the date of said election, and the publication thereof for the same length of time in some newspaper published in the district, and in case no paper is published in the district, then in a paper published in each county in which the district or any part thereof is located."

13. "43–303. MEETINGS OF BOARD.— . . .

. . . . .

"All meetings of the board must be public, and a majority shall constitute a quorum for the transaction of business; but on all questions requiring a vote there shall be a concurrence of at least a majority of the members of the board. All records of the board shall be open to the inspection of any elector during business hours."

14. "[Art. 3] § 1. LEGISLATIVE POWER—ENACTING CLAUSE—REFERENDUM—INITIATIVE.—The legislative power of the state shall be vested in a senate and house of representatives."

law becomes operative. *State v. Kellogg,* 98 Idaho 541, 568 P.2d 514 (1977); *Board of County Comm'rs v. Idaho Health Facility Authority,* 96 Idaho 498, 531 P.2d 588 (1975); *Boise Redevelopment Agency v. Yick Kong Corp.,* 94 Idaho 876, 499 P.2d 575 (1972). In deciding whether a delegation is proper the court must bear in mind the practical context of the problem to be remedied and the policy to be served. *State v. Kellogg, supra.*

> I.C. § 43–2203 provides in pertinent part: "Whenever the board shall by resolution adopted by a four fifths (⅘) majority of the said board, determine that the interest of said district and the public interest or necessity demand their construction, rehabilitation, replacement and improvement of any dam and other related structures and works together with all necessary appurtenances related thereto, in order to preserve, restore, protect and maintain rights of storage, diversion and delivery of water necessary and appurtenant to the purposes for which such district and other like similarly situated districts were organized . . .."

Thus, § 43–2203 authorizes the board to adopt a resolution for the replacement or improvement of a dam or related structure only when necessary, in the interest of the district or the public, "to preserve, restore, protect and maintain rights of storage, diversion and delivery of water necessary and appurtenant to the purposes" for which the district was organized. The board is not given unbridled authority to replace dams but is only authorized to do so when it finds that those conditions are present. We conclude, therefore, that § 43–2203 does not constitute an unlawful delegation of legislative authority; rather, the board is authorized to act only for a limited purpose in a limited manner after finding that certain conditions exist. *See Board of County Comm'rs v. Idaho Health Facilities Authority, supra; Boise Redevelopment Agency v. Yick Kong Corp., supra.*

8. The appellants next advance two alternative arguments concerning the findings of fact forming the basis of the resolution adopted by the Board of Directors of the AFRD. The appellants first argue that if the board's findings are conclusive then § 43–2203 constitutes an unconstitutional delegation of judicial power. The appellants then argue that if the findings are not conclusive, but are reviewable by the courts, then § 43–2204 requires the districts to set forth in a confirmation hearing the evidence considered by the board in making those findings and establish that such evidence supports the board's findings. The appellants argue that in this case the board did not consider any evidence but merely adopted a prepared resolution.

Neither argument has merit. The findings of the board are reviewable by the courts, and indeed I.C. § 43–2204 requires such judicial review. The particular resolution adopted by the AFRD states that the water level restrictions imposed on the American Falls dam because of its deteriorating condition resulted in a loss of storage capacity and adversely affected the water users.[15] The resolution itself therefore indicates the factual basis for the conclusion that the project was in the interest of the public and the district and was necessary to further the purposes enumerated in § 43–2203. The district court found that the "[l]oss of storage at the Existing Dam exposes the lands served by the Waterusers to potential loss of production and a resulting detrimental effect upon the agricultural economy of southern Idaho." The deteriorating condition of the dam and the restricted storage capacity were not contested

---

15. The resolution adopted November 4, 1975, states in part:

"*WHEREAS* the waterusers entitled to the use of water stored in the Existing Dam ("Waterusers"), have been adversely affected by storage restrictions on the reservoir capacity of the Existing Dam resulting from the fact that the United States Bureau of Recla-

mation has determined that Existing Dam to be no longer structurally competent and has placed restrictions upon the maximum water level in the reservoir, which restrictions presently permit the use of less than 67% of usable capacity, and the usable capacity will decrease as the deterioration of the Existing Dam advances; and . . . .."

**452**

by the appellants and the evidence at trial supports the finding concerning the economic importance of the dam.

9. The appellants argue that chapter 22, I.C. §§ 43–2201 to –2207, violates Art. 3, §§ 16 and 18, of the Idaho Constitution. Art. 3, § 16 of the Idaho Constitution provides:

"§ 16. UNITY OF SUBJECT AND TITLE.—Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

The appellants contend that there is insufficient unity between the subject and the title of the act adding chapter 22 to title 43 of the Idaho Code in that the act contains matters not expressed in the title. The title to the act in question states:

"AN ACT AMENDING TITLE 43, IDAHO CODE, BY THE ADDITION OF A NEW CHAPTER 22, TITLE 43, IDAHO CODE, RELATING TO IRRIGATION DISTRICTS; PROVIDING FOR THE RECONSTRUCTION OF DAMS AND RELATED APPURTENANCES FOR THE PURPOSE OF PRESERVING RIGHTS OF STORAGE, DIVERSION AND DELIVERY OF WATER, AND PROVIDING FOR THE EXECUTION OF CONTRACTS, THE IMPOSITION OF ASSESSMENTS AND THE ISSUANCE OF BONDS AND INTERIM NOTES, PROVIDING FOR THE TERMS AND CONDITIONS OF CONTRACTS, ASSESSMENTS, BONDS AND INTERIM NOTES, INCLUDING THE SOURCES OF PAYMENT OF BONDS AND INTERIM NOTES ISSUED HEREUNDER; PROVIDING FOR THE HOLDING OF ELECTIONS ON THE QUESTIONS OF THE ISSUANCE OF BONDS, THE EXECUTION OF CONTRACTS AND THE LEVY OF ASSESSMENTS; PROVIDING FOR JUDICIAL EXAMINATION OF ASSESSMENTS AND CONTRACTS;

PROVIDING FOR JUDICIAL PROCEEDINGS TO COMPEL ACTS TO BE TAKEN AND TO DETERMINE THE LEGALITY OF ELECTIONS, CONTRACTS AND BONDS AND LIMITATIONS ON SUCH PROCEEDINGS; PROVIDING FOR TAX EXEMPTION OF BONDS AND INTERIM NOTES AND INTEREST THEREON; PROVIDING FOR LIBERAL CONSTRUCTION; AND DECLARING AN EMERGENCY." 1974 Idaho Sess.Laws, ch. 1 at 3.

The law is settled that to warrant the nullification of a statute because its subject is not expressed in its title as required by this constitutional section "the violation must not only be substantial, but plain, clear, manifest and unmistakable." *Golconda Lead Mines v. Neill*, 82 Idaho 96, 103, 350 P.2d 221, 224–25 (1960). The purpose of this constitutional provision is to prevent fraud and deception in the enactment of laws and to provide reasonable notice to the legislators and the public of the general intent and subject matter of the act. *State v. O'Bryan*, 96 Idaho 548, 531 P.2d 1193 (1975). As such, the title of the legislative act need not serve as a catalog or index to the subject matter of the act, but need only set forth the general subject. *State v. O'Bryan, supra.* The title to the act in question here satisfies this standard. The title provides general notice of the subject matter contained in the act. The body of the act is not broader than the title and does not encompass subjects which are not germane to or which are incongruous with the title.

The appellants also contend that chapter 22 of title 43 was enacted in violation of Art. 3, § 18, of the Idaho Constitution since it purported to amend title 43 but did not set forth and publish at full length the section as amended.

Art. 3, § 18, of the Idaho Constitution provides:

"18. AMENDMENTS TO BE PUBLISHED IN FULL.—No act shall be revised or amended by mere reference to its title, but the section as amended shall be set forth and published at full length."

In *Noble v. Bragaw*, 12 Idaho 265, 85 P. 903 (1906), we considered the evil to be remedied by this constitutional provision:

> " 'This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purports only to insert certain words, or to substitute one phrase for another in an act or section, which was only referred to, but not published, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent.' " 12 Idaho at 277, 85 P. at 906 (quoting *People v. Mahaney*, 13 Mich. 481, 496–97 (1865).

Section 1 of the act in question states "that title 43, Idaho Code, be, and the same is hereby amended by the addition thereof of a new chapter, to be known and designated as chapter 22, and to read as follows: . ." 1974 Idaho Sess.Laws, ch. 1, § 1. The act was not an amendment or revision of an "act" or "section" within the meaning of Art. 3, § 18, of the Idaho Constitution, but was an entirely new and independent addition to title 43.

■ 10. The appellants argue that the proposed bond issue would constitute an unlawful extension of the credit of the irrigation districts to Idaho Power in violation of Art. 8, § 4,[16] and Art. 12, § 4,[17] of the Idaho Constitution. This same argument was raised and decided adversely to the appellants in *Barker v. Wagner*, 96 Idaho 214, 526 P.2d 174 (1974). In *Barker* we held that the limitations on indebtedness of Art. 8, § 3, of the Idaho Constitution did not apply to irrigation districts since the districts were not general governmental entities within the scope of that section. The petition for rehearing in *Barker* specifically requested this Court to consider whether the statutes and the proposed bond issue would create a loan of credit of the AFRD to Idaho Power Company and the other spaceholders in violation of Art. 8, § 4, and Art. 12, § 4, of the Idaho Constitution. In denying the petition for rehearing in *Barker*, we ruled:

> "The opinion of this Court that the American Falls Reservoir District was not a governmental entity is dispositive of the issues presented by the petition for rehearing concerning the applicability of other constitutional provisions." 96 Idaho at 218, 526 P.2d at 178.

However, regardless of our decision in *Barker*, the proposed bond issue is not violative of either Art. 8, § 4, or Art. 12, § 4, of the Idaho Constitution. We recently considered a similar issue in *Idaho Water Resource Board v. Kramer*, 97 Idaho 535, 548 P.2d 35 (1976). That case involved a joint

16. "[Art. 8] § 4. COUNTY, ETC., NOT TO LOAN OR GIVE ITS CREDIT.—No county, city, town, township, board of education, or school district, or other subdivision, shall lend, or pledge the credit or faith thereof directly or indirectly, in any manner, to, or in aid of any individual, association or corporation, for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any individual, association or corporation in or out of this state.

17. "[Art. 12] § 4. MUNICIPAL CORPORATIONS NOT TO LOAN CREDIT.—No county, town, city, or other municipal corporation, by vote of its citizens or otherwise, shall ever become a stockholder in any joint stock company, corporation or association whatever, or raise money for, or make donation or loan its credit to, or in aid of, any such company or association: provided, that cities and towns may contract indebtedness for school, water, sanitary and illuminating purposes: provided, that any city or town contracting such indebtedness shall own its just proportion of the property thus created and receive from any income arising therefrom, its proportion to the whole amount so invested."

454

venture between the Idaho Water Resource Board and Idaho Power Company in which the board was to construct two dams on the Snake River near an existing Idaho Power Company dam. Idaho Power in turn was to construct and own power generation facilities at the dams. The proposed joint venture required Idaho Power to make annual lease payments to the board. These payments were designed to cover the principal and interest payments due on bonds which the board was to issue in order to finance the project. In *Kramer* it was argued that the proposal constituted an unlawful loaning of the state's credit to a private entity in violation of Art. 8, § 2, of the Idaho Constitution.[18] That section is similar in terms to Art. 8, § 4, and Art. 12, § 4, except that it applies to the state. In *Kramer* we discussed at some length the purpose and intent of constitutional provisions prohibiting the loaning of the credit of a public entity to a private venture. 97 Idaho at 559–62, 548 P.2d 35. We upheld the proposed arrangement in *Kramer* on the ground that no state "debt" or "liability" for the benefit of private enterprise was created. Rather, in *Kramer* we concluded that since the bond payments were to be made only from a special fund consisting of the revenues generated by the project and that since the state could not in any circumstances levy taxes or encumber public property to pay any part of the bonds, the state was not placing its faith or credit behind their payment. Similarly, in this case the relevant portions of I.C. § 43–2201, the various contracts and the trust indenture clearly provide that the bond payments can be made only from a special fund. The only obligation the participating irrigation districts have with respect to that special fund and the bond payments as provided by § 43–2201 and their spaceholder contracts is to pay their respective portions of the principal and interest on the bonds. The participating irrigation districts are not obligated to pay the share of the bond payments which have been apportioned to other participating irrigation districts, other spaceholders or Idaho Power. We conclude that the proposed bond issue does not constitute an unlawful loaning of the credit of the irrigation districts in violation of either Art. 8, § 4, or Art. 12, § 4, of the Idaho Constitution.

11. The appellants contend that the resolution of the AFRD, the execution of the spaceholder contracts and the removal of appellant Kerner as president of the AFRD No. 2 were all *ultra vires* acts and were therefore void.

▮ (a) The appellants argue that the resolution for the bond issue adopted by the board of directors of the AFRD violated the provisions of I.C. § 43–322, which limits an irrigation district's power to incur debts. The appellants' argument is not well taken. In adopting the resolution proposing the bond issue, the board of directors of the AFRD was exercising the powers the legislature had given it in chapter 22 of title 43. I.C. §§ 43–2201 to –2207. I.C. § 43–2207 provides:

"43–2207. LIBERAL CONSTRUCTION. —Any restrictions, limitations or regulations relative to the issuance of such bonds or the execution of such contracts pursuant to the authority herein contained in any other act shall not apply to the bonds issued under this chapter or the execution of such contracts pursuant to the authority herein contained. Any act inconsistent herewith shall be deemed modified to conform with the provisions of this chapter for the purpose of this chapter only. This chapter being necessary to secure and preserve the public health, safety, convenience and welfare, and for the security of public and private property, it shall be liberally construed to effect the purposes of this chapter."

18. "[Art. 8] § 2. LOAN OF STATE'S CREDIT PROHIBITED—HOLDING STOCK IN CORPORATION PROHIBITED—DEVELOPMENT OF WATER POWER.—The credit of the state shall not, in any manner, be given, or loaned to, or in aid of any individual, association, municipality or corporation; nor shall the state directly or indirectly, become a stockholder in any association or corporation, provided, that the state itself may control and promote the development of the unused water power within this state."

Thus, the legislature specifically provided that restrictions contained in other statutes, such as I.C. § 43–322, were not to apply to a district exercising the powers granted it by chapter 22 or that such restrictions were to be considered as modified to the extent they were inconsistent with the provisions of chapter 22.

■ (b) The appellants also argue that until the spaceholder contracts were executed, the provisions of chapter 22 applied only to the "constructing district" (AFRD) and not to the "contracting districts." On this basis, the appellants argue that the contracting districts, such as the AFRD No. 2, executed spaceholder contracts unlawfully since I.C. § 43–404A requires a judicial confirmation, prior to the execution of the contract, in the county in which the district's office is located. In contrast to the provisions of I.C. § 43–404A, I.C. § 43–2204 requires the constructing district to commence the confirmation proceeding either before or after execution of the contracts and requires the contracting districts to join in that confirmation proceeding. It is apparent that both the AFRD, the constructing district, and the other participating districts, the contracting districts, were proceeding pursuant to chapter 22. As we discussed above, I.C. § 43–2207 specifically states that the restrictions in other statutes are not to apply to a district exercising the authority granted by that chapter. Accordingly, the irrigation districts, both the contracting and the constructing districts, need only comply with the requirements of chapter 22 with respect to confirmation proceedings. Moreover, the legislature, by requiring in I.C. § 43–2204 the constructing district to file a confirmation petition and by requiring the other participating districts to join in the petition, intended to spare the irrigation districts the burden of duplicative and repetitious confirmation proceedings in the situation where a number of districts were participating in a joint project to replace a dam. The appellants' interpretation of the statute, which would require each individual contracting district to hold a separate confirmation proceeding prior to executing the spaceholder contract and then join in another confirmation proceeding with the constructing district, would defeat the legislative purpose of § 43–2204 and would effectuate an unnecessary and burdensome result. *See Lawless v. Davis*, 98 Idaho 175, 560 P.2d 497 (1977).

■ (c) The appellants next argue that even if the provisions of chapter 22 control the actions of the contracting districts before execution of the spaceholder contracts, the board of directors of the AFRD No. 2 illegally removed appellant Kerner as president when he refused to execute the contract. The appellants contend that I.C. § 43–2205 required the board to institute legal proceedings to compel Kerner to execute the contract and to test the contract's validity and that the reorganization of the board and the subsequent execution of the contract by the new president therefore violated that section. I.C. § 43–2205 provides:

"43–2205. JUDICIAL PROCEEDINGS TO TEST VALIDITY.—In the event that any official required to participate in any act leading to the calling or holding of the required election, the execution of any required contract or the issuance of such bonds shall refuse to perform such act alleging as his reason illegality of the proposed election, the proposed contract or the bonds proposed to be issued, the board may institute judicial proceedings to compel such steps to be taken and legality of the election, contract or bonds to be determined. All cases in which there may arise a question of the validity of any proceeding under this act shall be advanced as a matter of immediate public interest and concern, and heard at the earliest practicable moment. The courts shall be open at all times for the purposes of this act."

That section, which authorizes the board to institute judicial proceedings to compel an official to execute a contract, is clearly permissive, neither mandatory nor exclusive. Idaho statutes clearly provide that the president of an irrigation district serves at the pleasure of the board. I.C. § 43–301 states in pertinent part:

**456**

"[T]he board of directors shall meet and organize as a board, elect a president from their number and appoint a secretary and treasurer, who shall each hold office during the pleasure of the board." Moreover, it is well established under general principles of law that the tenure of an officer in a municipal corporation, unless fixed by statute or otherwise, is at the will of the authority which appointed the officer. *Gowey v. Siggelkow*, 85 Idaho 574, 382 P.2d 764 (1963); 3 E. McQuillan, The Law of Municipal Corporations § 12.112 (3d ed. rev. vol. 1973); 56 Am.Jur.2d, Municipal Corporations, Counties, and Other Political Subdivisions, § 333 (1971). *Cf. Buckalew v. City of Grangeville*, 97 Idaho 168, 540 P.2d 1347 (1975) (removal of city police chief appointed to fixed term). In sum, the board of directors of the AFRD No. 2 was not statutorily required to institute legal proceedings pursuant to I.C. § 43–2205, and the board did not act improperly in removing Kerner as president, reorganizing and executing the contract.

■ 12. The appellants argue that the notices of the elections were inadequate because they failed to fully advise the electors of the effect the proposed contract would have on their rights under the existing contracts. In particular, the appellants contend that the notices did not inform the electors that under the new spaceholder contracts water would not be made available to a defaulting spaceholder or a non-participating water user. However, the notices of election specifically stated that delivery of water was contingent upon the execution of the spaceholder contract and upon the continued fulfillment of the obligations under that contract.[19] We conclude that the notices of election were sufficient to provide reasonable notice of the chief features of the proposal. *See Durand v. Cline*, 63 Idaho 304, 119 P.2d 891 (1941); *Corker v. Village of Mountain Home*, 20 Idaho 32, 116 P. 108 (1911); 15 E. McQuillan, The Law of Municipal Corporations § 40.07 (3d ed. rev. vol. 1970).

■ 13. The appellants argue that the additions to the government and spaceholder contracts made subsequent to the elections substantially affected the rights of the landowners and that new elections to approve those changes were therefore required. The notices of the elections stated that "proposed contracts in substantially

---

19. For example, the "Notice of Special Contract and Assessment Election for the A & B Irrigation District," which was published January 8, 1976, by the North Side News in Jerome, Idaho, states with reference to the delivery of water and defaults:

"(c) as provided in Section 3 of the Act of Congress approved December 28, 1973, as amended, delivery of water from the Replacement Dam to each of the Waterusers is contingent upon the execution of a Spaceholder Contract, and that if a Wateruser fails to execute a Spaceholder Contract within the time limits set forth in the contract proposed to be entered into between the United States and the American Falls Reservoir District, the United States shall be permitted to dispose of the space of the Wateruser on either a temporary or a permanent basis;

"(d) delivery of water from the Replacement Dam to each of the Waterusers is contingent upon the continued fulfillment of the obligations of the Waterusers under their respective Spaceholder Contracts, and that if a Wateruser is in default in the making of all or any part of the obligation of the Wateruser thereunder, the Spaceholder Contract may be terminated and the United States shall be

permitted to dispose of the space of the defaulted Wateruser on either a temporary or permanent basis;

"(e) providing for the use, under certain circumstances, of the water of a Wateruser which fails to execute a Spaceholder Contract, or of a defaulted Wateruser, by the Idaho Power Company upon the Company's payment of the Supplemental Falling Water Payments, as defined in the Falling Water Contract, for the purpose of preventing a default in the payment of principal of and interest on the bonds of the American Falls Reservoir District, and providing that should the Idaho Power Company fail to make any payments due under the Falling Water Contract, the United States shall suspend the use by the Idaho Power Company of water leaving the Replacement Dam.

.　　.　　.　　.　　.

"(i) Relating to matters incidental and ancillary to the principal provisions of the contract, including, among others, those relating to refusal to deliver water, imposition of penalties in case of default in payment of the contract obligations, remedies upon default if Idaho Power Company is also in default, .　.　.."

the forms on file" in the offices of the various irrigation districts would be executed if the proposal was approved by the voters in the election. Although the question submitted to the voters concerned approval of the proposed contracts, we believe that the general principles of law concerning changes in a proposed bond issue subsequent to voter approval are helpful in this case. These general principles have been summarized as follows:

"But the details of the indebtedness need not ordinarily be submitted [to voters] for approval or rejection. . . . So omission of directory provisions, as the fixing of the date, form and maturity of the bonds prior to the election to obtain authorization therefor will not render them void. Where electors were authorized to determine the amount of the bonds to be issued, this amount or the terms thereof cannot be varied thereafter by the municipal authorities. However, the approval of unnecessary details included in the proposition may subsequently be changed by the proper authorities." 15 E. McQuillan, The Law of Municipal Corporations § 40.08 at 248 (3d ed. rev. vol. 1970).

*Accord,* 64 Am.Jur.2d, Public Securities and Obligations, § 185 (1972). I.C. § 43–2204, which concerns the confirmation proceedings, provides in part that "[t]he court shall disregard any error, irregularity or omission which does not affect the substantial rights of the parties." However, I.C. § 43–2201(E) provides with respect to a reallocation of the costs:

"[P]rovided, however, that if the result of any such reallocation increases the obligation of any irrigation district under any contract or increases any assessment, any

such increase must be approved in the same manner as hereinabove required for the approval of the original contract or assessment, or both; . . . ."

Therefore, the contracts actually executed by the districts need not be identical in every respect to the contracts approved by the voters in the election. The districts may make minor changes in the details of the contracts without submitting them to the voters provided such changes do not increase the obligation of any irrigation district. If the district's obligation is increased, the modified contracts would have to be resubmitted to the voters for approval. I.C. §§ 43–2201(D)(1), 2201(D)(2), and –2201(E). It is the appellants' contention that the additions to the government and spaceholder contracts, which were made after the elections, increased the obligation of the participating districts and in effect reallocated to the participating districts the sums which would have been paid by those districts which rejected the proposal.

The form of the spaceholder contract which was on file at the time of the election provided that the costs of construction would consist of, among other things, payments to the constructing agency (the AFRD) necessary to reimburse it for payments made or costs incurred in connection with the construction of the replacement dam. That draft of the spaceholder contract further provided that the costs of construction would include payments of any other costs and expenses related to the construction of the replacement dam which would constitute a cost or expense for which monies in the construction fund could be used under Public Law 93–206, the Idaho statutory provisions and the indenture.[20]

---

20. The draft of the spaceholder contract provided in pertinent part:

"[Art. 20] (c) The Cost of Construction of the American Falls Replacement Dam Program shall consist of . . . (B) payments made under Section 602 of the Indenture for:

. . . .

(2) payment to the Constructing Agency, Spaceholders, or Idaho Power Company, as the case may be, of such amounts, if any, as shall be necessary to reimburse the Constructing Agency, Spaceholders, or the Idaho

Power Company in full for advances and payments made or costs incurred by them or any of them, prior to or after the execution of the Falling Water Contract, for expenditures in connection with the construction of the American Falls Replacement Dam Program, including, but not limited to preparation of the Plans, Designs and Specifications (as defined in the Falling Water Contract) and review thereof by the Contracting Officer; . . . . ."

With respect to the operation and maintenance of the completed replacement dam, this draft of the spaceholder contract provided that the spaceholder would pay to the United States a percentage of the total cost of operating and maintaining the replacement dam. The contract provided that these costs would be determined in accordance with the applicable provisions of the existing spaceholder contracts.[21] The existing spaceholder contracts provided that the costs of operation and maintenance included damage claims against the United States.[22]

The draft of the proposed government contract between the United States and the AFRD as the constructing agency which was approved in the election provided that the AFRD would indemnify the United States for all claims for damages made in connection with the construction of a replacement dam.[23]

Based on these contracts Field Solicitor Burpee of the Department of Interior concluded in his memorandum that even though the non-participating water users may have a cause of action against the

(13) payment of any other costs and expenses relating to the construction ·of the American Falls Replacement Dam Program which would constitute a cost or expense for which moneys in the Construction Fund may be used under the Act of December 28, 1973, the State Act and the Indenture, including fees and expenses of the Trustee during the construction period."

21. The draft of the spaceholder contract states: "[Art.] 28. (a) Upon substantial completion of construction of the Replacement Dam and the Related Facilities, the United States will operate and maintain the Replacement Dam and the Related Facilities as a part of the Minidoka Project for the beneficial use of the water on the land within the service areas of the Spaceholders pursuant to Section 8 of the Reclamation Act of June 17, 1902 (32 Stat. 388).
"(b) The Spaceholder Replacement Dam Operation and Maintenance Payments shall be paid by the Spaceholder to the United States and shall be (     %) of the total cost of operation and maintenance of the Replacement Dam and the Related Facilities not paid by the Idaho Power Company pursuant ·to Section 10.6 of the Falling Water Contract. Such costs shall be determined in accordance with the applicable provisions of the Existing Spaceholder Contract and shall continue to be due and payable to the United States on or before April 1 of each calendar year under procedures established therein."

22. For example, the existing repayment contract between the United States and the AFRD, Contract No. 14–06–W–59, provides:
"25. The costs which enter into the cost of operation and maintenance of the various reservoirs and the costs of delivery and distribution of water, portions of which costs are to be paid by the District, shall embrace all expenditures of whatsoever kind in relation to the function for which the charge is made, including, but without limitation by reason of this enumeration, cost of surveys and investigations, labor, property, material and equipment, engineering, legal, superin-

tendence, administration, overhead, general expenses, inspection, special services, and damage claims of all kinds whether or not involving the negligence of officers, agents or employes of the United States, but shall be exclusive of amounts which the law does not require to be repaid and which the Secretary determines as a matter of policy are to be treated as nonreimbursable."

23. The draft of the government contract provided:
"24. No liability shall accrue against the United States or any of its officers, agents, or employees for damage, direct or indirect, arising by reason of shortages in the quantity of water available through the Existing Dam or the Replacement Dam or interruptions in water releases resulting from drought, inaccuracy in distribution, hostile diversion, prior or superior claims, accident to or failure of the Existing Dam or the Replacement Dam, or the bypassing of water around·the Powerplant pursuant to Article 18(d) hereof, whether or not attributable to negligence of officers, agents, or employees of the United States or the constructing Agency, or other causes of whatsoever kind; nor shall the Constructing Agency's obligations to the United States under this Government Contract be reduced by reason of such shortages or interruptions.
"25. The Constructing Agency shall indemnify and hold harmless the United States, its officers, agents, or employees on account of all damages or claims for damages by whomsoever .made and of any nature whatsoever arising out of or in any manner connected with the construction of the Replacement Dam, the Related Facilities, or the Water Quality Facilities. This obligation includes, but is not limited to, any and all damages, including attorney costs, from claims of construction contractors, of subcontractors, of contractors or or firms furnishing materials, equipment supplies, or services, from all claims of the State of Idaho or of the Idaho Power Company."

United States if the United States should refuse to deliver them water, under the government contract "the American Falls Reservoir District is to indemnify and hold United States harmless from all claims arising out of the construction of the replacement dam." As a consequence of Burpee's memorandum and subsequent to the election, additions were made to the government and spaceholder contracts. Article 17(g) was added to the government contract.[24] That provision states that although the parties do not believe any grounds exist for awarding damages to a non-participating water user, if a non-participating water user is nevertheless entitled to damages from the United States for the loss of storage space, reimbursement to the United States is to be made from the construction fund, if monies are available in that fund, or otherwise the reimbursement is to be made as part of the operation and maintenance payments. Also, a new subsection 13 was added to Article 20(c)(B) of the spaceholder contracts. That subsection provides that "[p]ayments required to be made pursuant to Article 17(g) of the government contract" are to be considered as part of the construction costs.

The trial court ruled that these additions were only "clarifying revisions" and did not "affect the substantial rights of any spaceholder, the owner of any land within the area served by a spaceholder, or impose any greater obligation upon any spaceholder or landowner." The districts contend that these additions were made because Burpee's memorandum may have left the impression that the AFRD itself would be obligated to

indemnify the United States when in fact the terms of the contracts approved in the elections provided that these indemnity payments were to be included as part of the total project costs and were not special obligations of the AFRD. The districts argue that these additions were merely procedural, clarifying the manner in which such reimbursements, if any, to the United States would be made, and did not impose any obligation on the spaceholders or landowners which was not already present under the prior drafts. We agree. It is apparent that the obligation to indemnify the United States for any claims for damages resulting from construction of the replacement dam existed under the drafts of the contracts approved in the elections. The subsequent additions did not alter that indemnity obligation but only specified the procedure for making those reimbursements.

■ 14. The appellants in *Wixom* lastly argue that the district court should have denied the confirmation petition because of fraud, collusion, oppression and concealment by the AFRD and Idaho Power. The trial court found that "there is no evidence of collusion, fraud, conspiracy, oppression or concealment in connection with the American Falls replacement dam program." I.R. C.P. 52(a) provides in part: "Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appear personally before it." The trial court made its finding following a lengthy trial in

---

24. Article 17(g) of the final version of the government contract provides:

"[17] (g) Although the parties hereto do not believe that any grounds exist for the awarding of damages to a Non-Participating Wateruser, if as a result of the application of this Article 17, a final determination of a court of competent jurisdiction holds that a Non-Participating Wateruser, whose use of space is permanently terminated, is nevertheless entitled to damages from the United States for the loss of such space, money in the construction fund (as defined in the Falling Water Contract), not necessary to pay other costs of construction of the American Falls

Replacement Dam Program shall be used for such purpose, otherwise such amount shall be reimbursed to the United States as part of the Spaceholder Replacement Dam Operation and Maintenance Payments. In all other instances, to the extent related to the cost of the American Falls Replacement Dam Program, where a final determination of a court of competent jurisdiction holds that a Non-Participating Wateruser is entitled to damages from the United States as a result of the application of this Article 17, such amount shall be reimbursed to the United States as part of the Spaceholder Replacement Dam Operation and Maintenance Payments."

which this issue was extensively litigated. The court's finding is supported by the evidence and it will not be disturbed on appeal.

The judgment of the district court in *Boards of Directors v. Wixom*, No. 12656, is affirmed.

## IV

In *Kerner v. Johnson*, No. 12356, the appellants argue that the district court of the Fifth Judicial District erred in dismissing the appellants' declaratory judgment action. The appellants brought the action pursuant to Title 10, chapter 12, of the Idaho Code, which authorizes declaratory judgments. I.C. §§ 10–1201 through –1217. The justiciable controversies alleged by the appellants in their complaint for a declaratory judgment were essentially (1) whether the repayment contract executed by the AFRD No. 2 was null and void because a confirmation proceeding had not been brought prior to its execution as required by I.C. § 43–404A and because the board of directors of the AFRD No. 2 had improperly removed appellant Kerner as president and had reorganized and executed the contract without instituting the legal proceedings provided by I.C. § 43–2205, and (2) whether the board was required to call a new election because of the additions to the spaceholder contract and the government contract. On this basis the appellants prayed in their complaint for a judgment (1) declaring the spaceholder contract null and void as to the AFRD No. 2, (2) ordering the board to call a new election to approve the amended contracts, (3) requiring confirmation proceedings pursuant to I.C. § 43–404A, and (4) enjoining the district from giving any legal effect to the spaceholder contract. The district court dismissed the action on the ground that the issues raised could be litigated in the confirmation proceedings required by I.C. § 43–2204 and that those proceedings afforded the appellants an adequate remedy.

The appellants argue that the court had jurisdiction over the declaratory judgment action and was under a duty to exercise it. The appellants refer to I.R.C.P. 57 which provides in part that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."

The order of the trial court dismissing the declaratory judgment action was dated May 4, 1976, approximately one week prior to the time the confirmation petition in *Wixom* was filed on May 12, 1976. Therefore, there was not "another action pending between the same parties for the same cause" within the meaning of I.R.C.P. 12(b)(8) which would have authorized the dismissal of the action under that rule. Neither does it appear that there was any reason contemplated by I.C. § 10–1206 which would have justified the district court in refusing to enter a declaratory judgment. Therefore, unless the enactment of I.C. §§ 43–2204 and –2205 resulted in an implied repeal of title 10, chapter 12, regarding declaratory judgments, as that act relates to matters within the scope of title 43, chapter 22, the district court erred in dismissing the declaratory judgment proceeding. The provisions of I.C. § 43–2204, which provide for judicial examination of proceedings to confirm a proposal for the sale and issuance of bonds pursuant to that chapter, appear to mandate such a confirmation proceeding "prior to the sale and issuance of any bonds," but there is no requirement that bonds be sold or issued even though an election has been conducted. Likewise, the proceeding authorized by I.C. § 43–2205, as we have already stated above, is permissive and not mandatory. Therefore, it is doubtful whether the enactment of I.C. §§ 43–2204 and –2205 constituted an implied repeal of the declaratory judgment act, I.C. §§ 10–1201 to –1217, as it relates to the circumstances in this case. In the absence of such an implied repeal, the district court would have erred in dismissing the action.

However, it is unnecessary to resolve that issue in this case. Regardless of the dismissal of the declaratory relief action, on May 4, 1976, all of the issues raised in the declaratory judgment action in *Kerner* were fully litigated in the confirmation proceeding in *Wixom*. We have af-

firmed in Part III of this opinion the decision of the trial court in *Wixom*, and that decision is now *res judicata* as to those issues. Therefore, no useful purpose would be served by reversing the judgment of the district court in *Kerner* and remanding the matter to the district court where it would only have to be dismissed because of the *res judicata* effect of *Wixom*. It would thus appear that the issues raised in *Kerner* are now moot because of their disposition in *Wixom*. This Court may dismiss an appeal where it appears that only a moot question is involved. *Downing v. Jacobs*, 99 Idaho 127, 578 P.2d 243 (1978). *Western Beverage, Inc. v. State*, 96 Idaho 588, 532 P.2d 930 (1974); *Idaho State Park Bd. v. City of Boise*, 95 Idaho 380, 509 P.2d 1301 (1973); *Tryon v. Baker*, 94 Idaho 222, 485 P.2d 964 (1971). Therefore the appeal in *Kerner v. Johnson*, No. 12356, is dismissed.

SHEPARD, C. J., and McFADDEN, DONALDSON and BISTLINE, JJ., concur.