Argued and submitted February 11, reversed and remanded for entry of summary judgment in favor of plaintiffs May 5, petition for attorney fees allowed by opinion July 8, 2004

See 194 Or App 133, 93 P3d 841 (2004)

Petition for review on the merits allowed August 10, 2004 (337 Or 282)

# Jeffrey B. KERR,
## Michael Kelley, and Jann Carson,
### *Appellants,*

*v.*

# Bill BRADBURY,
## Secretary of State for the State of Oregon,
### *Respondent.*

## 02C-21814; A121744

89 P3d 1227

Charles F. Hinkle argued the cause for appellants. With him on the briefs was ACLU Foundation of Oregon, Inc.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong, Judge, and Barron, Judge pro tempore.

LANDAU, P. J.

## LANDAU, P. J.

Article IV, section 1(2)(d), of the Oregon Constitution provides that "[a]n initiative petition shall include the full text of the proposed law or amendment to the Constitution." In this case, the Secretary of State (secretary) certified an initiative petition for circulation, even though the text of the petition sets out only the wording proposed to be added to existing statutes and does not include the text of the statutes to be amended. Plaintiffs initiated this action for declaratory and injunctive relief, arguing that the initiative petition cannot be certified because it fails to include the text of the statutes as they would read if the proposed amendments were to be approved by the voters. Plaintiffs argue that the full text of the "proposed law" within the meaning of Article IV, section 1(2)(d), refers to the full text of the law *as amended*. The trial court disagreed and entered summary judgment for the secretary. Plaintiffs appeal, arguing that the trial court erred in construing Article IV, section 1(2)(d), to require publication only of the text of the proposed amendments. We agree and reverse.

## I.   BACKGROUND

Members of the Oregon Citizens Alliance (OCA) filed with the secretary a proposed initiative petition for the 2004 general election entitled the "OCA Student Protection Act III." That proposed initiative petition reads as follows:

"BE IT ENACTED BY THE PEOPLE OF THE STATE OF OREGON:

"Section 1.   ORS 336.067 is amended to read (new section):

"(e)   Whereas sexual orientation is a subject with moral implications best addressed by parents and families; and whereas the cause or causes of homosexuality or bisexuality have not been scientifically determined so as to conclude that homosexuality or bisexuality is innate or unchangeable; and whereas the behaviors of homosexuality and bisexuality pose a serious health risk to Oregon's students; therefore, notwithstanding any other law or rule, it is hereby established that sexual orientation shall not be

taught in Oregon public schools in a manner that would express approval of, promote or endorse the behaviors of homosexuality or bisexuality.

"For the purposes of this statute, sexual orientation as it relates to homosexuality and bisexuality is defined as yielding to urges or temptations to engage in sexual activity with members of the same gender.

"(1)   This statute shall be a limitation upon the state of Oregon's institutions of education and its employees but shall not limit the established First Amendment rights of students to freedom of speech or association or any other constitutional rights.

"(2)   This statute shall not be construed to limit or diminish the teaching of age-appropriate, objective and factual AIDS education or instruction regarding human sexuality provided such teaching upholds the prohibitions and provisions established in this statute.

"(3)   This statute shall not be construed to limit or diminish any educational institution from protecting its students from being subjected to derogatory name calling provided such protection is accomplished in a manner that upholds the prohibitions and provisions established in this statute.

"(4)   This statute shall not be construed to limit or impede school counselors, teachers and other school personnel from affirming the human worth of all students provided such affirmation is accomplished in a manner that upholds the prohibitions and provisions established in this statute.

"(5)   This statute shall not be construed to limit or impede school counselors, teachers and other school personnel from making every effort to prevent students from taking their own lives, who may be troubled by same-sex attractions and/or gender-identity confusion or for any other related reason, provided such assistance is accomplished in a manner that upholds the prohibitions and provisions established in this statute.

"(6)   This statute shall not be construed to cause the termination of teachers, even if it becomes known that they have been or are involved in homosexual or bisexual behavior, provided they exercise their duties in a manner that

upholds the prohibitions and provisions established in this statute.

"(7)   This statute shall not be construed to forbid the mere mention of the behaviors of homosexuality or bisexuality, such as, but not limited to, that an author was homosexual or bisexual, provided the manner in which it occurs upholds the prohibitions and provisions established in this statute.

"(8)   According to Article 1, section 1 of the Oregon Constitution, the People intend that if any aspect of this statute is ruled to be unconstitutional, the remaining parts shall be retained in full force and effect.

"Section 2.   ORS 659.155 is amended to read (new section):

"(1)   In Oregon's public schools, any elementary or secondary school determined by the Superintendent of Public Instruction or any community college determined by the Commissioner for Community College Services or any four-year college or university determined by the Chancellor of the State Board of Higher Education to be in noncompliance with provisions of ORS 336.067 (e) or ORS 659.150 and this section shall be subject to appropriate sanctions, which may include withholding of all or part of state funding, as established by rule of the State Board of Education."

The proposed initiative thus seeks to amend two statutes: ORS 336.067 and ORS 659.155.

ORS 336.067 currently provides:

"(1)   In public schools special emphasis shall be given to instruction in:

"(a)   Honesty, morality, courtesy, obedience to law, respect for the national flag, the Constitution of the United States, and the Constitution of the State of Oregon, respect for parents and the home, the dignity and necessity of honest labor and other lessons which tend to promote and develop an upright and desirable citizenry.

"(b)   Respect for all humans, regardless of race, color, creed, national origin, religion, age, sex, or disability. Acknowledgment of the dignity and worth of individuals and groups and their participative roles in society.

"(c)   Humane treatment of animals.

"(d)  The effects of tobacco, alcohol, drugs and controlled substances upon the human system.

"(2)  The Superintendent of Public Instruction shall prepare an outline with suggestions which will best accomplish the purpose of this section, and shall incorporate the outline in the courses of study for all public schools."

ORS 659.155, on the other hand, currently does not exist. Before 2001, there was a statute codified at ORS 659.155, which has since been renumbered as ORS 659.855. That statute provides:

"(1)  Any public elementary or secondary school determined by the Superintendent of Public Instruction or any community college determined by the Commissioner for Community College Services to be in noncompliance with provisions of ORS 659.850 and this section shall be subject to appropriate sanctions, which may include withholding of all or part of state funding, as established by rule of the State Board of Education.

"(2)  Any public institution of higher education determined by the Chancellor of the Oregon University System to be in noncompliance with provisions of ORS 659.850 and this section shall be subject to appropriate sanctions, which may include withholding of all or part of state funding, as established by rule of the State Board of Higher Education.

"(3)  Any public charter school determined by the sponsor of the school or the Superintendent of Public Instruction to be in noncompliance with the provisions of ORS 659.850 and this section shall be subject to appropriate sanctions, which may include the withholding of all or part of state funding by the sponsor or superintendent, as established by rule of the State Board of Education."

The secretary designated the OCA petition as Initiative Petition 16 (2004). He then determined that it satisfies all constitutional requirements for submission of initiative petitions. Plaintiffs, three Oregon voters, brought this action against the secretary, requesting a declaration that Initiative Petition 16 fails to satisfy the full-text requirement of Article IV, section 1(2)(d), and requesting that the secretary be enjoined from certifying the proposed measure to the ballot.

Plaintiffs and the secretary then filed motions for summary judgment. The trial court denied plaintiffs' motion, granted the secretary's motion, and entered judgment dismissing the complaint. The trial court concluded that Article IV, section 1(2)(d), requires the publication only of the full text of wording that is to be added to a statute and does not require publication of the text of the statute to which the wording would be added.

## II.  ANALYSIS OF THE MERITS

■      On appeal, plaintiffs argue that the trial court erred in construing Article IV, section 1(2)(d), to require publication only of the amendatory text proposed by the initiative petition. According to plaintiffs, by its plain meaning, that constitutional provision requires that an initiative petition contain the full text of the "proposed *law*" as it will read if the proposed amendment is enacted. Plaintiffs point out that Article IV, section 22, imposes a similar requirement on the legislature to publish "at full length" the text of the act or section to be amended and not just the amendatory wording. It makes no sense, plaintiffs argue, to impose different publication requirements depending on the source of an amendment.

The secretary argues that, by its terms, Article IV, section 1(2)(d), requires the publication only of the text of the "*proposed* law," that is, the new text that is to be added to the statute, not including the text of the existing law that is to be amended. The fact that Article IV, section 22, imposes a different publication requirement, the secretary argues, is of no moment. The secretary insists that, whether or not it makes sense as a matter of policy, the fact remains that the wording of Article IV, section 1(2)(d), is different from that of Article IV, section 22, and it should be interpreted accordingly. Moreover, the secretary argues, in *Schnell v. Appling*, 238 Or 202, 204-05, 395 P2d 113 (1964), the Oregon Supreme Court interpreted Article IV, section 1, to require publication only of amendatory wording, and that construction is controlling.

Plaintiffs reply that the secretary's reliance on *Schnell* is misplaced because the decision construed an earlier version of Article IV, section 1, a version that did not contain any reference to the "full text of the proposed law."

The initiative and referendum provisions of Article IV, section 1, were added to the Oregon Constitution by the voters in 1902 and then amended in 1968. Because it is not part of the original constitution, our task in interpreting it is to determine the intent of the voters in accordance with the analytical method set out in *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559-60, 871 P2d 106 (1994), which is the same method of analysis that must be applied in the interpretation of statutes as described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We begin with an analysis of the text in context and, if necessary, also refer to enactment history and other aids to construction. *Ecumenical Ministries*, 318 Or at 560; *PGE*, 317 Or at 612.

A. *Textual analysis*

■    We begin with the required textual analysis. As we have noted, Article IV, section 1(2)(d), provides, in part, that "[a]n initiative petition shall include the full text of the proposed law." The constitution does not define the term "proposed law." When the constitution does not define its terms, we presume that the voters intended those terms to be given their ordinary meanings. *Ecumenical Ministries*, 318 Or at 560.

At the time of the enactment of Article I, section 1(2)(d), "propose" was defined as "to offer for consideration, discussion, acceptance or adoption." *Webster's New Int'l Dictionary* 1985 (unabridged 2d ed 1961). The term "law" commonly meant, as pertinent to this case:

"The binding custom or practice of a community; rules or mode of conduct made obligatory by some sanction which is imposed and enforced for their violation by a controlling authority."

*Id.* at 1401. *Black's Law Dictionary* 1028 (revised 4th ed 1968) similarly defined the term:

"That which is laid down, ordained, or established. A rule or method according to which phenomena or actions co-exist or follow each other. That which must be obeyed and followed by citizens, subject to sanctions or legal consequences.

"\* \* \* \* \*

"[A] distinct and complete act of positive law.

"\* \* \* \* \*

"[R]evised statutes."

Taking the pertinent words as they were ordinarily understood at the time that Article I, section 1(2)(d), was enacted, the state's position that the constitutional reference to "proposed law" refers only to proposed amendatory wording becomes unlikely, at best. Amendatory wording, which often consists of mere phrases and even single words, is not itself "law," proposed or otherwise.

For example, ORS 12.115(1) currently provides, "In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of." If an initiative petition were filed that proposed to amend the statute by deleting the number "10" and substituting the number "15," in no reasonable sense would "proposed law" consist only of the term "15." In the ordinary meaning of the term, the "full text of the proposed law" would be the full text of the statute itself as it would appear if the amendment ultimately were enacted.

Of course, we do not examine constitutional wording in a vacuum. We must examine the constitutional provision at issue in context. Part of the relevant context is changes to the wording of the provision itself. *See Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994) (applying principle to statutory interpretation). In this case, as originally adopted, Article IV, section 1, required that all initiative petitions "include the full text of the measure so proposed." That wording—requiring publication of the full text of the proposed "*measure*"— stands in contrast to the current wording, adopted in 1968, which requires publication of the proposed "*law*."

That difference in wording could indicate a difference in meaning. *See, e.g., State v. Guzek*, 322 Or 245, 265, 906 P2d 272 (1995), *superseded by statute on other grounds as stated in State v. Moore*, 324 Or 396, 414 n 13, 927 P2d 1073

(1996) (in the absence of evidence to the contrary, courts presume that differences in phrasing suggest differences in meaning). Prior construction of the term "measure," however, suggests that no such difference in meaning was intended.

*Palmer v. Benson*, 50 Or 277, 91 P 577 (1907), for example, involved a referendum petition that contained a different title from the title of the act that had been passed by the legislature. Opponents of the referendum argued that the "measure" could not be certified to the ballot because of the discrepancy in the titles. The Supreme Court held that the difference in titles had no constitutional significance. In the process, the court explained this about the initiative and referendum powers:

> "The purpose of the petition for referendum is to identify a particular enactment of the legislative assembly which the petitioners desire to have referred to the people—a question of identity, not of legislation. There is a distinction in that regard between the referendum and the initiative, in which latter legislation is initiated, and the whole matter must be formulated just as it is to be submitted to the people, while in the referendum it is only a question of the approval or disapproval by the people of what the legislature has already enacted as a law. Section 1 of Article IV of the Constitution of Oregon recognizes this distinction by providing that the initiative petition shall 'include the full text of the measure,' while as to the referendum no reference is made as to the manner in which the measure shall be mentioned in the petition."

*Id.* at 279-80. The Supreme Court distinguished between the role of referendum and initiative, noting that proposed legislation referred to the voters need only be identified so as to permit voter approval or disapproval, while the initiative is a legislative act by the voters themselves that requires inclusion of "the full text of the measure." Thus, the court indicated that the full-text provision of the original Article IV, section 1, meant "the whole matter * * * as it is to be submitted to the people" by initiative—that is, both the amendatory wording and the text of the statute to be amended. *Id.*

Similarly, in *Herbring v. Brown*, 92 Or 176, 180 P 328 (1919), the court held that the initiative and referendum

powers do not apply to voter approval of mere resolutions; the "measure" that is presented to the voters must be a proposed *law*. *Id.* at 181-82.

Current phrasing of Article IV likewise suggests that the term "measure" does not have a meaning distinct from a proposed "law." For example, sections 1(4)(b) and (c) refer, respectively, to initiative "measures" being submitted to the people and elections on such "measures" being held at regular elections, unless otherwise ordered by the legislature. Similarly, section 1(4)(d) refers to the effective date of an initiative "measure." All of those "measures" are references to the "proposed law[s]" in section 1(2)(d).

We also consider as part of the context of a constitutional provision other provisions on similar or related subjects. *Ecumenical Ministries*, 318 Or at 560. In this case, both parties draw our attention to Article IV, section 22, which requires that, when the legislature amends an existing statute, "the act revised, or section amended shall be set forth, and published at full length." The wording is slightly different from that of Article IV, section 1(2)(d). On the one hand, section 1(2)(d) refers to publication of the entirety of the "proposed law," while on the other hand, section 22 refers to publication of the entirety of the "act revised, or the section amended." Is there a substantive difference between the "proposed law" and the "act revised"?

In the abstract, that is a possibility. Again, the difference in phrasing could signal that the voters intended a difference in meaning. *Guzek*, 322 Or at 265. The fact that a difference in wording could signify a difference in meaning, however, does not necessarily mean that it does so. In fact, for at least two reasons, we conclude that it is unlikely that the difference in wording does suggest a difference in meaning.

First, to conclude that sections 1(2)(d) and 22 of Article IV have different meanings—certainly the different meanings that the secretary proposes—would require us to conclude that the framers of the original constitution intended that legislators be provided with the full text of statutes to be amended when voting on proposed amendments, while the framers of the 1968 amendment intended that voters not be entitled to the same information. The secretary has

suggested no reason why the voters in 1968 would have intended that difference, and we can imagine none.

Second, the Supreme Court has construed other parallel provisions of Article IV that apply to initiated and legislatively enacted legislation to have the same meaning despite minor differences in phrasing. *OEA v. Phillips*, 302 Or 87, 727 P2d 602 (1986), is directly on point. At issue in that case was whether the "one subject" requirement of Article IV, section 1(2)(d)—that a law proposed to be adopted by initiative "shall embrace one subject only and matters properly connected therewith"—should have a meaning different from the requirement of Article IV, section 20—that every act proposed by the legislature "shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title." The court held that nothing in the minor differences in the wording or in the history of the provisions suggested that the framers of the constitution intended the two sections to have different meanings. *OEA*, 302 Or at 100; *see also Armatta v. Kitzhaber*, 327 Or 250, 272, 959 P2d 49 (1998) (reaffirming that the differences in wording between the one subject provisions of Article IV, sections 1(2)(d) and 20, have no legal significance).

Contextual analysis also includes an examination of case law construing relevant constitutional provisions. *Martin v. City of Tigard*, 335 Or 444, 451, 72 P3d 619 (2003). In this case, both parties devote much attention to the Supreme Court's decision in *Schnell*. Indeed, the secretary claims that it is dispositive.

*Schnell* involved the meaning and application of the version of Article IV, section 1, in effect before the 1968 amendments. At that time, as we have noted, Article IV, section 1, provided that all initiative petitions "shall include the full text of the measure so proposed." The petitioners in *Schnell* filed a petition to amend the workers' compensation statutes in two ways. First, the petition proposed to alter the wording of existing law; it did so by publishing, in full, the text of the existing law and showing specific words and phrases to be deleted and substituted. Second, it proposed to repeal certain of the existing statutes outright; it did so by reference to the provisions to be repealed by section numbers

only.[1] The Secretary of State concluded that the petition conformed to all relevant constitutional requirements for placing it on the ballot. The plaintiffs disagreed and initiated an action to enjoin the secretary from placing the petition on the ballot at the next general election. The plaintiffs argued that the petition violated Article IV, section 1, because it failed to publish the full text of the statutes that were to be repealed. They also complained that the petition mentioned other statutes that would *not* be affected by the proposed amendment and did so by reference to those statutes by section number only. *Schnell*, 238 Or at 203-04.

Thus, the issues before the court were whether the text of a statute *to be repealed* is a part of the "full text of the measure so proposed" and whether the text of other statutes referred to in the measure *but unchanged by it* also must be published in the petition. The court's answer was brief (one paragraph) and uncomplicated. The text of a statute to be repealed simply is not part of what the statute will look like if the measure passes, nor is the text of a statute referred to in the measure, but unchanged by it. Therefore, they are not part of the "proposed measure" and need not be published in the initiative petition. In the court's words:

> "The text of repealed statutes, like that of statutes referred to in the proposed measure, would be no part of the enacted statute should it pass, and some means would have to be found for eliminating such surplusage after enactment. No useful purpose would be served by quoting at length either the related statutes referred to in the proposed measure but left unchanged thereby or the statutes to be repealed thereby. Since such matter is no part of the proposed law, it need not be made a part of the initiating petition."

*Id.* at 204-05.

Caution is warranted in reading the court's decision too broadly. *Schnell*, after all, construed the earlier version of Article IV, section 1, not the version that is before us. Moreover, as we have noted, the issue before the court in *Schnell* was a narrow one. It concerned only the question whether statutes to be repealed and statutes that are mentioned, but

---

[1] The text of the proposed initiative petition is not quoted in the text of the court's opinion. It is included with the parties' briefs, however.

that would be unchanged by the proposed amendment, must be published at full length. Neither question is presented in this case. The court's holding, in other words, does not bear on the issue before us.

The secretary insists that *Schnell* should be understood to have held that Article IV, section 1(2)(d), requires publication of only amendatory wording because the opinion contains a citation to a Massachusetts Supreme Court decision that, in turn, contains phrasing that more broadly proclaims that only the full text of amendatory wording is constitutionally required. In fact, in 1941, the Supreme Court of Massachusetts did issue an advisory opinion to the legislature about the meaning of that state's constitutional "full text" requirement. *Opinion of the Justices*, 309 Mass 555, 34 NE2d 431 (1941). In that opinion, the court did conclude that "[t]he words 'full text,' as used in the constitutional provisions, refer to the precise terms of a proposed measure and nothing more." *Id.* at 433. And the Oregon Supreme Court did cite the Massachusetts court's opinion. It did so, however, for a limited purpose.

The Massachusetts opinion spoke to the question whether it was necessary to include the text of statutes that were to be amended. As we have noted, the initiative petition at issue in *Schnell* set out in full the text of the statutes that it sought to amend, so the Oregon court had no occasion to speak to the issue before the Massachusetts court. The problem before the Oregon court was that the initiative petition did not set forth the text of statutes that it sought to repeal or that were referred to but not changed. The Oregon court simply referred to the Massachusetts advisory opinion and declared that it was applying the rule invoked in the Massachusetts case to the particular problem presented in the Oregon case. Thus, the Oregon court stated: "The same rule should apply to repealed statutes." *Schnell*, 238 Or at 204. The court did not discuss, much less endorse, the application of the rule to other circumstances.

B. *Enactment history*

We are mindful of the Supreme Court's admonition that we must be cautious about ending our interpretive analysis at the textual level, because it is rare that "the text

and context of a constitutional provision reflect the intent of the voters so clearly that no alternative reading of the provision is possible." *Coultas v. City of Sutherlin*, 318 Or 584, 590, 871 P2d 465 (1994). We therefore turn to the enactment history of Article IV, section 1(2)(d), to determine whether it confirms or contradicts what our analysis of the text suggests about its intended meaning. The enactment history of a constitutional amendment adopted by initiative includes material published in the voters' pamphlet for the relevant election. *Ecumenical Ministries*, 318 Or at 560 n 8.

As we have noted, the "full text" provision of Article IV, section 1, originally was adopted as part of the constitution in 1902, when the citizens of Oregon adopted the constitutional amendment that reserved to the people the powers of initiative and referendum. We have been unable to locate any enactment history that bears on the meaning of the provisions of the 1902 amendment that imposes the requirement that each initiative petition must include "the full text of the measure so proposed."

"Full text" provisions are not uncommon features of state constitutions, however. Their general purposes are fairly well-established. As the Oregon Supreme Court explained of Article IV, section 22, which, as we have noted, is a similar provision that applies to amendments proposed by the legislature:

> "This section was adopted for good reasons. It has been a custom with our legislatures to amend existing laws by mere reference to their titles, and under that cover, to change words and phrases anywhere in its sections; to insert and strike out sentences; to repeal parts of sections at one session, and at the next to re-repeal and amend until it had become a real task to discover what was the existing statute on many subjects, and without the utmost watchfulness the legislators could not know the extent or effect of proposed amendments."

*City of Portland v. Stock*, 2 Or 69, 71-72 (1863).

Courts in other states with similar constitutional provisions characterize their purposes in similar terms. *See, e.g., In re Miller*, 29 Ariz 582, 244 P 376, 379-80 (1926) (Without setting out in full the act as it was intended to read after

amendment, "no one could possibly know by reading the act itself what the law was, but before a legislator could vote understandingly upon such an amendment, or one called upon to construe the law after its adoption could do so intelligently, it would be necessary for [the person] to ascertain how the original act with all previous amendments, if any, read. This place[s] an unnecessary burden upon both and the purpose of this provision [is] to prevent legislation in any such manner."); *Kerner v. Johnson*, 99 Idaho 433, 583 P2d 360, 380 (1978) ("The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws."); *Weyerhaeuser v. King County*, 91 Wash 2d 721, 592 P2d 1108, 1114 (1979) (purpose of full text provision "is to ensure that legislators are aware of the nature of the law being amended and the effect the particular amendment will have"); *see also* Norman J. Singer, *Statutes and Statutory Construction* § 22:9, 278-79 (6th ed 2002) ("The purpose of a provision prohibiting the enactment of legislation that revises or amends other acts without setting them forth at full length is to insure that legislators are aware of the nature and content of the law which is being amended and the effect of the amendment upon it, by disclosing the act's impact on existing laws."); Note, *Constitutional Limitations on Amendments in Indiana*, 28 Ind LJ 65, 66 (1952) (parallel provision in Indiana Constitution "and its counterparts in other states were adopted to prevent 'blind' amendments which identify the act to be amended and then merely provide for the addition or deletion of certain words or figures without setting forth the text of the act or section as amended").[2]

---

[2] Indiana case law concerning the parallel provision of the Indiana Constitution—from which Article IV, section 22, was derived—is especially interesting. The Indiana courts originally were so concerned about the evils of legislation by mere reference that they construed the constitutional full text requirement to necessitate the publication of the full text of the relevant statute both before and after amendment. In *Greencastle Southern Turnpike Co. v. The State*, 28 Ind 382 (1867), however, the Indiana Supreme Court held that it is necessary to publish the full text of only the relevant statutes as amended. The court's explanation of its decision seems especially instructional:

The purposes of "full text" provisions that apply to amendments by initiative commonly are described in similar terms. *See, e.g., Mervyn's v. Reyes*, 69 Cal App 4th 93, 81 Cal Rptr 2d 148, 151 (1998) ("The purpose of the full text requirement is to provide sufficient information so that registered voters can intelligently evaluate whether to sign the initiative petition."); *State v. Fulton*, 99 Ohio St 168, 124 NE 172, 175 (1919) (publication of full text of amended constitutional provision required because it is "essential for the elector to have * * * the section which is proposed to be added to or subtracted from. If he is to vote intelligently, he must have this knowledge. Otherwise in many instances he would be required to vote in the dark.").

As we have noted, the original full-text provision of Article IV, section 1, was amended in 1968 as part of a larger amendment to the constitution. In its entirety, the 1968 referendum provided:

"CONSTITUTIONAL AMENDMENT

"*Be it resolved by the Legislative Assembly of the State of Oregon:*

"(1)    Sections 1 and 1a, Article IV of the Constitution of the State of Oregon, are repealed, and the following section is adopted in lieu thereof:

"**Section 1.**    (1)    The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

"(2)(a)    The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

---

"The words 'act revised or section amended' would seem to admit of but one interpretation. 'Blackstone revised,' 'Kent revised,' would be understood to mean the new, and not the old books. So, an amended edition of Blackstone or Kent would be understood to signify the new work, with the errors of the old corrected and proper additions made. It would mean, however, the entire work as revised and amended, and not the changes alone."

*Id.* at 383.

"(b)   An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c)   An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(d)   An initiative petition shall include the full text of the proposed law or amendment to the Constitution. A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith.

"(e)   An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon.

"(3)(a)   The people reserve to themselves the referendum power, which is to approve or reject at an election any Act, or part thereof, of the Legislative Assembly that does not become effective earlier than 90 days after the end of the session at which the Act is passed.

"(b)   A referendum on an Act or part thereof may be ordered by a petition signed by a number of qualified voters equal to four percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition. A referendum petition shall be filed not more than 90 days after the end of the session at which the Act is passed.

"(c)   A referendum on an Act may be ordered by the Legislative Assembly by law. Notwithstanding section 15b, Article V of this Constitution, bills ordering a referendum and bills on which a referendum is ordered are not subject to veto by the Governor.

"(4)(a)   Petitions or orders for the initiative or referendum shall be filed with the Secretary of State. Signatures of qualified voters on an initiative or referendum petition filed with the Secretary of State that have not been verified before the filing of the petition may be verified thereafter,

but signatures not verified within the 15-day period after the last day on which the petition may be filed as provided in paragraph (e) of subsection (2) or paragraph (b) of subsection (3) of this section shall not be counted.

"(b)   Initiative and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith.

"(c)   All elections on initiative and referendum measures shall be held at the regular general elections, unless otherwise ordered by the Legislative Assembly.

"(d)   Notwithstanding section 1, Article XVII of this Constitution, an initiative or referendum measure becomes effective 30 days after the day on which it is enacted or approved by a majority of the votes cast thereon. A referendum ordered by petition on a part of an Act does not delay the remainder of the Act from becoming effective.

"(5)   The initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district. The manner of exercising those powers shall be provided by general laws, but cities may provide the manner of exercising those powers as to their municipal legislation. In a city, not more than 15 percent of the qualified voters may be required to propose legislation by the initiative, and not more than 10 percent of the qualified voters may be required to order a referendum on legislation."

Official Voters' Pamphlet, Primary Election, May 28, 1968, 10-11.

As described in the explanation provided in the voters' pamphlet, the proposed constitutional amendment had "three main purposes." First, it was intended to "change the basis for determining the number of signatures required for initiative and referendum petitions." Before 1968, the constitution required the number of petition signatures to be calculated as a percentage of votes cast for Supreme Court Justice in a prior election. The 1968 amendment was intended to change the calculation to a percentage of votes cast for Governor at the preceding election. *Id.* at 8.

Second, the 1968 amendment was intended "to repeal several obsolete sections of the existing Constitution relating to the mechanics of bill preparation in the Legislative Assembly and to the rights of a member of the Legislative Assembly to introduce measures." That purpose was "purely 'clean-up' of the wording" and was not intended to diminish the power of the people to initiate or refer measures. *Id.*

Third, the 1968 amendment was intended to allow additional time after the filing deadline for petition signatures to be certified by county clerks. *Id.*

The explanation in the voters' pamphlet does not mention other purposes than the three "main" ones. The secretary proclaims from that silence the conclusion that the "history of the 1968 amendment refutes plaintiffs' claims." The secretary's reasoning, however, does not withstand careful scrutiny.

The secretary takes as his premise that, in *Schnell*, the Supreme Court definitively determined that the full-text provision of the pre-1968 version of Article IV, section 1, required the publication of only amendatory wording. Then he concludes that, because nothing in the enactment history suggests that the voters intended, in effect, to overturn that decision, it cannot be construed to have that effect.

The argument suffers from at least two critical flaws. First, it suffers from a faulty premise. As we have noted, in *Schnell*, the Supreme Court did not address the issue before us, much less definitively rule on it. Second, and in any event, reasoning from silence in the legislative record is at best risky and, at worst, illogical.[3] It is at least equally plausible to infer that the framers of the measure simply considered the change in wording of the "full text" provision as something other than one of the three "main" purposes. Indeed, in our view, it is more likely that there is no mention

---

[3] Logically, it is permissible to draw a negative inference about the framers' intentions from their silence only if what they did say purported to be a complete statement of what they intended. *See generally* David Hackett Fischer, *Historians' Fallacies: Toward a Logic of Historical Thought* 47-48 (1970) (discussion of fallacy of negative proof). In this case, by the very terms of the explanation in the voters' pamphlet, that is not so.

of the subject in the legislative history because *Schnell* did not, in fact, hold that the prior version of Article IV, section 1, required publication of amendatory wording only; thus, there was no need for an explanation, because the amendments to Article IV, section 1, did not change the law in that respect.

In short, nothing in the enactment history directly confirms or contradicts what our textual analysis suggests as to the intended meaning of the current wording of Article IV, section 1(2)(d).

## C.   *Relevant canons of constitutional construction*

To recap the bidding thus far, we have examined the text of Article I, section 1(2)(d), which requires that initiative petitions include the "full text of the proposed law." We have concluded that the reference to publication of the "proposed law" strongly suggests that the section was intended to require publication of the text of the relevant statute as amended if the measure were to pass. Indeed, we have concluded that that is the only construction that gives the words—in particular, the word "law"—their ordinary meaning. We have identified nothing in the context of the constitutional provision that contradicts what the ordinary meaning of the terms suggests. Nor have we identified any case law that precludes the text from meaning what it fairly clearly seems to say.

In an abundance of caution, we also have consulted the enactment history. Nothing in that history, however, speaks to the issue one way or the other. Continuing with our cautionary approach, we resort finally to the third level of constitutional analysis to ensure that no relevant principles of constitutional construction preclude the interpretation that we have identified as most faithful to the text. *See generally State v. Lanig*, 154 Or App 665, 674, 963 P2d 58 (1998) (resorting to canons of constitutional construction to resolve ambiguity in voter-initiated constitutional amendment). The parties have cited to us no canon of constitutional construction that counsels against giving Article I, section 1(2)(d), the interpretation that we have suggested, and we are aware of none.

The only canon of construction that appears arguably relevant suggests that the text of Article IV, section 1(2)(d), means, as we have suggested from the outset, what it says. Generally speaking, when we are confronted with an ambiguous enactment, and resort to textual and historical analysis does not resolve the ambiguity, we attempt to determine what the voters would have intended had they thought about the specific issue. *See, e.g., State v. Brooks*, 187 Or App 388, 398, 67 P3d 426, *rev den*, 335 Or 578 (2003) (applying canon). In this case, we know that the framers of the Oregon Constitution enacted Article IV, section 22, to ensure that legislators not be required to vote on legislation "in the dark," that is, without knowing the effect of the proposed enactment on existing statutes. *Stock*, 2 Or at 71-72. The question before us is whether it is likely that the voters adopted Article IV, section 1(2)(d), with a similar purpose in mind.

The answer seems apparent to us. It is, frankly, difficult for us to imagine that the voters intended that they be provided with less information about the effect of proposed statutory amendments than what the constitution mandates legislators must be provided when voting. It seems much more likely to us that, in adopting Article IV, section 1(2)(d), the voters intended to require publication of the same information—that is, the full text of the statute as it would appear if amended—regardless of whether the amendment is proposed by the legislature or by initiative.

D.  *Application of Article I, section 1(2)(d)*

Having determined that Article I, section 1(2)(d), requires publication of the full text of the statute as it would appear if the initiative petition were to be enacted, the question whether Initiative Petition 16 satisfies that requirement is not difficult to determine. There is no dispute that the petition sets out only the text of the amendatory wording. It does not contain the text of either ORS 336.067 or ORS 659.855 as they would read if the petition were to be enacted. It necessarily follows that the initiative petition does not publish the "full text of the proposed law[s]," as Article IV, section 1(2)(d),

requires. We therefore conclude that the trial court erred in granting the secretary's summary judgment motion and in denying plaintiffs' motion.

Reversed and remanded for entry of summary judgment in favor of plaintiffs.